## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

ANDREA YAMALATH RISHMAWY,

        Petitioner,

  v.

JAIME VERGARA; and LAUREN BROOKS,

        Respondents.

CIVIL ACTION NO.: 4:21-cv-35

## **O R D E R**

Petitioner Andrea Yamalath Rishmawy (hereinafter "the Mother") initiated this action by filing a Petition for the Return of the Minor Child Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "the Petition") against Respondents Jaime Vergara (hereinafter "the Father") and Lauren Brooks (hereinafter "Ms. Brooks"). (Doc. 1.) The Court conducted a bench trial on the Petition on April 12 and 13, 2021. For the reasons set forth below, the Court **GRANTS** the Mother's Petition.

## BACKGROUND

### I.    The Hague Convention and the International Child Abduction Remedies Act

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter the "Hague Convention") Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11, in 1980 "[t]o address the problem of international child abductions during domestic disputes." Lozano v. Montoya Alvarez, 572 U.S. 1, 4 (2014) (internal quotation marks omitted).

In 1988, the United States ratified the Convention and passed the International Child Abduction Remedies Act (hereinafter "ICARA"), 102 Stat. 437, as amended, 22 U.S.C. § 9001 et seq., the implementing legislation in the United States.  See 22 U.S.C. §§ 9001, et seq.  The treaty was ratified between the United States and Honduras on June 1, 1994.  See U.S. Hague Convention Treaty Partners, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited May 2, 2021).  ICARA's provisions "are in addition to and not in lieu of the provisions of the Convention."  22 U.S.C. § 9001(b)(2).

> It is the [Hague] Convention's core premise that "the interests of children . . . in matters relating to their custody" are best served when custody decisions are made in the child's country of "habitual residence."  Convention Preamble, Treaty Doc., at 7; see Abbott v. Abbott, 560 U.S. 1, 20 (2010).
>
> To that end, the [Hague] Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides.  Art. 12, Treaty Doc., at 9 (cross-referencing Art. 3, id., at 7).  The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence.  Art. 3, ibid.

Monasky v. Taglieri, -- U.S. --, 140 S. Ct. 719, 723 (2020).  "The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings.  Upon the child's return, the custody adjudication will proceed in that forum."  Id. (citing Linda Silberman, *Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence*, 38 U.C.D.L. Rev. 1049, 1054 (2005)).

## II.    Procedural History

The Mother initiated this case by filing her Petition with the United States District Court for the Southern District of Florida on January 12, 2021.  (Doc. 1.)  Therein, the Mother alleged that, after the Father took their now three-year-old minor child (hereinafter "the Child") out of Honduras for an agreed-upon short-term visit, the Father and co-Respondent Lauren Brooks (who

was believed to be the Father's girlfriend or wife) wrongfully retained the Child in the United States beginning on October 12, 2020, and had since refused to return the Child to the Mother. (Id. at p. 5.)  The district court in the Southern District of Florida ordered that service be perfected by the United States Marshals Service for that district, (doc. 9), and also entered an order prohibiting the Respondents from removing the Child from the United States, (doc. 13).  On February 5, 2021, after learning that the Marshals Service had been advised, during a service attempt, that Respondents and the Child had relocated to Savannah, Georgia, which is within this Court's district, the court in the Southern District of Florida transferred the case to this Court.[1] (Doc. 19.)  Upon receiving the case, this Court entered an Order requiring the Respondents to remain in the Southern District of Georgia with the Child while the case is pending and to surrender to the United States Marshals Service for this district all travel documents for themselves and the minor child.  (Doc. 38.)  The Marshals Service perfected service upon both Respondents, who surrendered various passports and similar documents.  (See doc. 41.)

After engaging in an abbreviated discovery period, the parties appeared before the Court for a two-day bench trial.[2]  While the Respondents, as well as counsel for Petitioner and

---

[1]  See 22 U.S.C. § 9003(b) (a court "is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed").  As described in more detail below, Respondents and the Child were located in Savannah, Georgia, prior to and at the time the Petition was filed.

[2]  The Certified Transcript of the bench trial has been prepared at the Court's request and filed with the Clerk of Court in two volumes.  (Doc. 108; doc. 109.)  In this Order, the Court will cite to the volumes of the Trial Transcript as "Vol. I" and "Vol. II," respectively.  Pursuant to the Guide to Judiciary Policy § 510.25.10 (b), the transcript will be available at the Clerk's Office for inspection for a period of 90 days. Any party who wishes to obtain a copy of the transcript at the prescribed Judicial Conference rates must contact the Court's Official Court Reporter, Kelly McKee, at 912-650-4065.  The parties agreed on the admission of the majority of their Exhibits in advance of trial and filed those Exhibits as Joint Exhibits 1 through 64 at Docket Number 98.  However, due to a marking alteration, the parties designated Joint Exhibit 10 as a blank.  (See doc. 98-10.)  Thus, Joint Exhibits 1 through 9 and 11 through 64 were admitted at trial and are filed at Docket Numbers 107-1 through 107-63.  Petitioner introduced two exhibits which are filed at Docket Numbers 107-64 and 107-65, and Respondent introduced two exhibits which are filed at Docket Numbers 107-66 and 107-67.  In this Order, the Court will cite to the parties' Joint Exhibits as "J. Ex.", to

Respondents, appeared in person, Petitioner and all other witnesses attended the trial via video teleconference. Having considered the evidence admitted at trial, counsels' arguments, the parties' Proposed Findings of Fact and Conclusions of Law, (doc. 103; doc. 104), the record, and the applicable law, the Court hereby issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any finding of fact may be construed as a conclusion of law, the Court adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.[3]

## III.    Findings of Fact

### A.    The Mother and the Father's Relationship and the Child's Early Life

The Mother is citizen of Honduras. (Doc. 84, p. 2.) The Father is citizen of Spain and has residency status in the United States, Guatemala, and Jamaica. (Id.; doc. 103, p. 3.) They met in Guatemala sometime prior to July 2017 and became romantically involved. (Vol. II, p. 32.) They have never been married. (Doc. 84, p. 2.) Their romantic relationship ended in July 2017, but several weeks thereafter the Mother discovered she was pregnant with the Child. (Vol. II, pp. 32–

---

the Petitioner's Exhibits as "P. Ex.", and to Respondents' Exhibits as "R. Ex." Additionally, the parties reached stipulations in advance of trial and filed those at Docket Number 84.

[3] In an action tried without a jury, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). However, "Rule 52(a) does not require a finding on every contention raised by the parties" and the Court is "not required to discuss all evidence presented at trial." Wachovia Bank N.A., Nat'l Ass'n v. Tien, 598 F. App'x 613, 617 (11th Cir. 2014) (citing Stock Equip. Co. v. Tennessee Valley Auth., 906 F.2d 583, 592 (11th Cir. 1990) and Feazell v. Tropicana Prods., Inc., 819 F.2d 1036, 1042 (11th Cir. 1987)). "[T]he findings of the trial court must be specifically detailed to give [an appellate court] a clear understanding of the analytical process by which ultimate findings were reached and to assure [the appellate court] that the trial court took care in ascertaining the facts." Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 433 (5th Cir. 1977). In this Order, the Court discusses the parties' evidence specifically and at length in this Background Section and explains its determination of contested legal issues in detail in the Discussion Section. Many of the Court's determinations in the Discussion Section involve mixed questions of law and fact. Thus, within that Section the Court often recounts or refers to the pertinent facts set out in the Background Section and specifically and separately explains where it credits one party's testimony or evidence over another. Given the length and depth of this Order, the Court is confident that the parties and the appellate court will be able to understand the analytical process by which the Court reached its conclusions.

33.)  The Mother moved to Honduras before giving birth to the Child in April 2018.  (Id.; doc. 84, p. 1.)  The Father is listed as the Child's father on her birth certificate.  (J. Ex. 58; Vol. II, p. 32.) The Child is a citizen of Honduras and, by virtue of the Father's Spanish citizenship, she is also a citizen of Spain.  (Doc. 84, p. 1; Vol. I, p. 192; Vol. II, pp. 135–36.)

Before the Child was born, the parties considered entering into a formal parenting agreement but ultimately decided not to do so.  (Vol. II, p. 66.)  The Father testified that, instead, they agreed to have shared custody and decision-making authorities, (id.), and that the Child would live in the custody of the Mother in Honduras, but would be in the Father's custody from time to time when he was able to travel to Honduras, (Vol. I, p. 105; see also doc. 84, p. 2 (stipulation by the parties that the "Mother has rights of custody to the Child")).  Consistent with this agreement, absent two brief trips, from her birth in April 2018 until August 2020, the Child spent the entirety of her life in Honduras.  (Vol. I, p. 105.)  Around the time that the Child was born, the Father was living and working in Jamaica, but he received permission to work from Honduras for the period of three days prior to the Child's birth until approximately one month after the Child was born. (Id. at p. 98; Vol. II, p. 31.)  For some time after the Child was born, the Father would go to Honduras every two months, spend two weeks with the Child, and then fly out of Honduras and return to wherever he was living and working at that time.  (Vol. I, pp. 98–99; Vol. II, p. 36.)  From August 2019 until June 2020, the Child was enrolled in an early learning center in Honduras, and the Father was integrally involved in the Child's enrollment at that school.  (J. Ex. 60; Vol. II, pp. 37, 135.)

### B.    The Father's Efforts to Obtain Residency Status for the Child in the United States

The Father testified that the parties had "always" discussed having the Child go to school in the United States.  (Vol. II, pp. 39–40.)  The Father, who already had an L-1 visa "to work in

the United States" when the Child was born, explained that this desire for the Child to attend school in the United States was one reason he obtained an L-2 visa for her (as his dependent) in 2019 and has begun the process of seeking permanent resident status for her in the United States. (Id. at pp. 32, 39–40, 55.)

As discussed more fully below, the record shows that the Father and the Child were issued United States visas (an L-1 for him and an L-2 for her) from Jamaica on September 25, 2019, and that both visas expire on February 1, 2022. (J. Ex. 53.)  In January 2020, the Father took the Child to the United States from Honduras to apply in person for a social security number for her. (Vol. II, pp. 52–54.)  In late February, the Father's employer submitted, on his behalf, an "Immigration Petition for Alien Workers" that states that he is "in the United States and will apply for adjustment of status to that of lawful permanent resident" and also lists the Child as a dependent and states that she is also "applying for adjustment of status." (J. Ex. 29, pp. 1, 6–7.)  According to the Father, "the next step in the process [was that the Child] would need to come in to the United States, and then the adjustment of status process would start." (Vol. II, p. 54.)  The Father testified that his understanding was that "[i]f you do not use your L-1 or L-2 visa within the first six months of obtaining it, then it becomes voided," which in turn would mean permanent residence status can no longer be pursued;[4] accordingly, he testified, he believed that the Child's physical presence in the United States was required once she was issued a visa in order for him to proceed with seeking permanent resident status for her. (Id. at pp. 54, 56, 137.)  The Father also testified that, because the visa lasts for ten years, "you could process the residency for the ten years." (Id. at p. 57.)

---

[4]  The Father did not elaborate on the extent to which a visa must be "used" to prevent having it become voided.  For instance, he did not comment on or present evidence indicating whether the two days the Child spent in the United States before flying to Jamaica in August 2020 would qualify as a sufficient "use" of the visa or whether a much longer stay is actually necessary.

While the Mother's signature or formal consent was not required, the Father claims that the Immigration Petition was submitted with the Mother's "full consent," and he testified that, "[e]very time [he has] done anything regarding [the Child's] papers, [they have] had lengthy conversations so that [the Mother] understood.  And then [they] sent [the Mother] an email with the explicit reason to also confirm it."  (Id. at pp. 53, 55.)  He also testified that he specifically told the Mother that the Child "needed to fly and stay in the United States so that the L-1 [sic] visa would be eligible to process into residence."  (Id. at p. 56.)

The Mother, on the other hand, testified that the parties only had more generalized discussions about sending the Child to school in the United States, and she denied that any actual plans had been made for the Child to move to the United States at any particular time.  (Vol. I, p. 172 ("There was a conversation that we had that probably one day he would move to the United States and it was an option for her to grow up there in the future."); see also id. at pp. 170–71 (The Father had, in the past, said that he thought it was a good idea for the Child to live in the United States "and other countries.").)  The Mother said that, while she was aware that, after the Child was born, the Father was "doing a legal thing for [the Child]," she "did not know exactly what he was doing" when he was doing things like having the Child get a social security number or filling out paperwork for the Child to become a permanent resident of the United States.  (Vol. I, p. 173.)  She testified that she "thought it was just some type of permit, like in the visa you could travel in and out," and she "didn't know the process of what that meant" nor did she understand that it was "a permanent residence as to her living."  (Id. at p. 212.)  The Mother, who overstayed in the United States on a temporary visa when she was a minor, has applied for—and been denied—a United States visa three times as an adult, and the Father is aware of her current inability to go to the United States.  (Id. at pp. 154–55; Vol. II, p. 98.)

According to the Father's testimony at the trial on April 13, 2021, the Child's petition for permanent residence status in the United States is "currently processing and under review." (Vol. II, p. 55.)

### C.   Prior Travel, Travel Authorizations, and the Settlement Agreement

Both parents and the Mother's expert witness on Honduran law testified that, in Honduras, a parent is not allowed to travel out of the country alone with his/her minor child unless he or she has a signed authorization from the child's other (non-traveling) parent. (Vol. I, pp. 77, 177; Vol. II, p. 49.) Notably, all three individuals testified that the authorization is required in order for the parent and the child to *leave* Honduras; no testimony was presented indicating that a travel authorization is required in order for the parent and child to return. Likewise, no testimony was presented that indicated that a travel authorization must state when the parties will be returning to Honduras or that the traveling parent will be reuniting the child with the other parent.

In December 2018, the Father executed a travel authorization that permitted the Mother to travel with the Child from Honduras to meet him for a visit with the Child in Spain in December 2018. After the Mother and the Child arrived in Spain, the Father kept the Child with him in Spain from December 24, 2018, through January 10, 2019, at which point the Child and the Mother returned to Honduras. (Vol. I, pp. 98–99; Vol. II, p. 35.) Both parties agree that this is the only time the Child has ever been to Spain. (Vol. I, pp. 106–07.) The Father estimates that, thereafter, he visited the Child in Honduras about five to six times in 2019. (Id. at p. 99.)

The Father testified that, by May of 2019, there had been one or more incidents where, after he and the Mother had agreed on something concerning the Child, the Mother later backtracked and refused to cooperate. (Vol. II, pp. 38–39.) As a result, that same month, the Father hired an attorney in Honduras and filed a petition in that country for communication and access to the Child. (Vol. I, p. 72.) The Father testified that, at the time he filed that action, he

and the Mother were in the midst of one such disagreement.  (Vol. II, pp. 39–40.)  According to

the Father, he and the Mother—at an unspecified time—"had agreed that [they] were going to start

processing [the Child's] residence in the U.S.," but the Mother was refusing to give him the Child's

passport, which he needed for the application process.  (Vol. II, pp. 39–42; see also Vol. I, p. 158.)

After he filed the action in Honduras, the Mother agreed to give him temporary possession of the

passport on the condition that he execute an affidavit stating the specific purpose for which he was

taking the passport and promising to return the passport to the Mother.  (See J. Ex. 27 (document

signed by the Father stating that he is receiving the Child's passport "in order to submit it to the

Consulate of the United States of America in the country of Jamaica, and process his and the

minor's residence in the L-1 category that grants a residency in the United States for up to 10 years

based on his current job" and that he agrees to return the passport "to the mother and legal guardian

of the Child" when it is returned to him).)  Despite testifying that he had to take legal action in

order to get the Mother to give him the Child's passport, the Father testified that the Mother was

"100 percent supportive of [him taking the Child's passport for use in getting a visa for the Child]

because of the expectation and the discussion that [they] had . . . that it was also going to be easier

for [the Mother] to get residency in the United States once [the Child] was a resident."  (Vol. II, p.

50.)  The Mother, however, testified that she does not remember ever actually seeing the affidavit

about the passport prior to filing her Petition initiating this case.  (Vol. I, pp. 173–74.)  According

to the Mother's testimony at the hearing, the extent of her understanding was that the Father needed

the passport for the "L-1 visa" and she did not know that he was using the passport for the process

of establishing *residency* for the Child in the United States.  (Id.)

    Notwithstanding the fact that the parents resolved the passport dispute, the Father

continued to prosecute the communication and access proceeding, because, he explained, he

wanted a set agreement establishing specific dates for his visits with the Child that the Mother "could actually be held accountable to" and he wanted to be able to prevent her from "backtrack[ing]" after he made arrangements for future visits and travel. (Vol. II, pp. 43–44.)

Several months later, while the Honduran case was still pending, the parents had another disagreement, this time about the precise dates on which the Child would travel with the Father to Miami, Florida, in January 2020. (Id. at pp. 43–44; see also J. Ex. 64.) Over the course of several email exchanges, they disagreed about when the Father could begin his visit with the Child (with the Mother stating that she and the Child had a trip planned and the Child would not be back home and available for a visit with him until January 7). (See J. Ex. 64.) In response, the Father wrote: "I remind you that we agreed on [earlier] dates indeed, because [the Child] has an appointment with the United States government to get her social security number." (Id. at p. 9.) The Father testified that he had discussions with the Mother about the need to obtain the Child's social security number, which he described generally as "the next step in the process." (Vol. II, p. 53.) He testified that, because of this dispute, he "had to file another petition" with the Honduran court in November 2019, and, one day after he filed, the Mother "backtracked again" and agreed to sign an authorization allowing him to take the Child on the requested dates. (Id. at pp. 43–44.) Pursuant to that travel authorization, the Child traveled with the Father from Honduras to the United States on January 3, 2020. (Id. at p. 53.) While in the United States, the Father and the Child went to the appointment for her social security number and stayed in Miami through January 12, 2020, at which point the Father returned the Child to the Mother in Honduras. (Vol. I, pp. 175–77; Vol. II, pp. 54–55.)

One month later, on February 12, 2020, the Mother and the Father executed a Settlement Agreement establishing a "Communication and Visit[ation] Regime and other provisions"

(hereinafter the "Settlement Agreement").   (See J. Ex. 9.)   In Paragraph One, the Settlement Agreement provides that the Child will "share a full month during the year" with the Father sometime during July and/or August.  (Id. at p. 5.)  According to the document, this "regime" was to begin in July or August 2020, during which time the Child would be permitted to stay with the Father in either Miami, Florida, or Jamaica.  (Id.)  According to Paragraph Two, for winter holidays the Child would spend Christmas with one parent but would spend a period including the immediately following New Year's Eve and King's Day (in January) with the other parent.  (Id.)  The agreement specifies that, for winter 2020–2021, the Child would be with the Mother for Christmas 2020 and the Father had a "commitment to come for [the Child] in Honduras" on December 28, 2020, and to "return[] her on January 9, 2021."  (Id.)  The Settlement Agreement also gave the Father two weeks with the Child every April, to celebrate his own birthday and the Child's birthday.  (Id.)  Specifically, for April 2020, the Settlement Agreement provided that he was to come for the Child in Honduras on April 18 and that he "undert[ook] to return her to her mother's home" on May 2.  (Id. at pp. 5–6.)  The Settlement Agreement also stated that the parents had "agreed that [the Child] should start school studies at Sampedrana International School," which is located in Honduras.[5]  (Id. at p. 6; Vol. I, p. 115.)  Finally, the Father agreed to "pay the alimony in favor of [the Child]" in the amount of $700.00 per month, plus $212.00 per month for the Child's school tuition and transportation.  (J. Ex. 9, pp. 6–7.)  In closing, the Settlement Agreement states that "both parents should always act with the necessary flexibility . . . and in the interests of the [C]hild."  (Id. at p. 7.)  The Father's attorney filed the executed Settlement Agreement with the court in Honduras, seeking that court's ratification of the agreement.  (Id. at

---

[5]  The Mother testified that, prior to taking the child out of Honduras in August 2020, the Father applied for the child to attend this school in Honduras beginning in August 2021.  (Vol. I, pp. 186–87.)

p. 8.)   On March 13, 2020, the Honduran Court ordered that the Settlement Agreement had been introduced to that court and that it would hold a hearing to decide whether it would approve the agreement on June 24, 2020.   (Id.)   However, the Honduran courts shut down due to the COVID-19 pandemic before the hearing could be held.  (Vol. I, pp. 83–84; Vol. II, p. 116.)  Therefore, the parties' agreement has never been ratified by the Honduran court.  (Doc. 84, p. 2.)

In January 2021, the Mother filed a request for the annulment of the Settlement Agreement that had been filed with the Honduran court since, in her view, the Father has already acted in non-compliance by keeping the Child longer than the time allotted to him therein.  (Vol. I, pp. 91, 164–65.)  The Father claims the parties entered into a subsequent—albeit unwritten—agreement (that the Child would reside full-time in his custody in the United States) that superseded the Settlement Agreement, so he agrees—though for a different reason—that the Agreement should not be signed by the court.  (Vol. II, pp. 124–25.)  The Father, however, has not taken any steps to have the Honduran proceeding dismissed or to withdraw the Settlement Agreement from the Honduran court's consideration, so the case—and, at this time, the Settlement Agreement—remain pending for a determination by the Honduran court.  (See Vol. I, pp. 93–94; Vol. II, pp. 116–17.)

### D.      Events Following the Execution of the Settlement Agreement

Roughly two weeks after the Mother and the Father signed the Settlement Agreement—which provided that the Child would live with the Mother and attend school in Honduras, among other terms—the previously referenced "Immigration Petition for Alien Workers" was signed and submitted on behalf of the Father (and the Child).  (J. Ex. 29.)  The Petition states that the Father last arrived in the United States on September 30, 2019, that he has L-1A status, that his authorized stay expires February 1, 2022, and that he is "in the United States and will apply for adjustment of status to that of lawful permanent resident."  (Id. at p. 6.)  It also states that his last country of

residence was Spain.  (Id.  at p. 7.)  Toward the end, the document lists the Child as a dependent and states that she is "applying for adjustment of status."  (Id.)  As noted previously, at this time, no decision has been issued regarding the Immigration Petition.

Given the pandemic and its impact on global travel at the time, the Father did not have the April 2020 visit (which was provided for in the Settlement Agreement) with the Child.  (Vol. I, p. 165.)  At some point after April, the parties began arranging the July/August visit provided for in the Settlement Agreement.  Meanwhile, at some point prior to late July 2020, the Mother decided to sell her vehicle to a buyer referred to her by her mechanic.  (Id. at p. 149.)   When she tendered the vehicle to the buyer, she failed to remove some documents containing her name, address, and other identifying and personal information.  (Id.)  Several days later, the Mother learned that the buyer of the vehicle had been kidnapped.  (Id.)  This incident—coupled with the fact that her personal information was in the vehicle and thus available to the kidnappers—caused her to be concerned about her safety.  (Id.)  As a result, following discussions with the Father, the Mother decided that she and the Child should leave Honduras.  While it is undisputed that the Mother decided to go to Spain, the parties disagree about the decision regarding the Child.  The Mother claims that she and the Father agreed that, at the end of the Child's upcoming visit with the Father, he would return the Child to the Mother in Spain, and the Child would begin living in Spain with the Mother.  The Father, on the other hand, claims that they agreed that, when the Child left Honduras with him, the Child would move to the United States and live permanently with him there.  This dispute is central to the determinations the Court must make in this Order.  Accordingly, a meticulous review of the testimony and documentary evidence on these points is prudent and is set forth below.

### 1.     The Mother's Testimony

The Mother testified that she and the Father agreed as follows:

> . . . I was going to arrive to Spain.  I was going to live in an area close to his parents so that they had access to the [C]hild, in a good area, in a good neighborhood.  And that after I had my residence and after I had a home, he would then travel to Spain to deliver the [C]hild back to my custody.

(Vol. I, p. 149.)  The Mother explained that, while moving to Spain was "an idea that [she] had," she only made the final decision to go through with moving there because the Father "talked to [her] about it, and . . . convinced [her]."  (Id. at p. 160.)  The decision was made "mostly from [the Father] convincing [her]" and "insisting of the benefit of Spain."  (Id. at pp. 168, 184.)  The Mother (whose own parents are both deceased and whose siblings live in various parts of the world) testified that she thought moving to Spain was a good idea because the Father's parents and other close family members live there and the Father travels there multiple times per year.  (Id. at p. 162.)  The parties introduced into evidence a copy of an email that the Mother sent to the Father on July 20, asking for his input on a draft of a letter she was considering sending to her employer in Honduras, requesting permission to work remotely from Spain.  (J. Ex. 43.)  In the letter, the Mother wrote that she needed to flee the country as soon as possible for safety reasons and she noted that "[her] daughter has [a] Spanish passport since her father is from there."  (Id.)  When asked at the hearing whether she "ever [had] any intent to live in Spain if [the] child was not going to be returned to her," the Mother answered flatly, "No, I did not."  (Vol. I, p. 150.)

The Mother vehemently denies that the parties agreed for only the Mother to move to Spain and for the Child to live in the United States and to visit Spain from time to time.  For instance, when asked squarely, on cross-examination, whether "Spain was picked so that you could ensure that each and every time that [the Father] would go to visit his family in Spain, that the [C]hild then would be brought to you so that you could see the [C]hild as well," the Mother answered,

14

flatly, "no."  (Id. at p. 162.)  Similarly, when asked whether the agreement that she and the Father

made—for her to move to Spain—was "another agreement" made "subsequent to" the Settlement

Agreement, the Mother made clear that the decision about moving to Spain was not "another

agreement" because the Settlement Agreement's terms regarding when and for how long the Father

would visit with the Child (i.e., around her birthday, on vacation days and holidays, and for a

month in the summer) would still be the same; they would just be exercised with the Child living

in Spain.  (Id. at pp. 162–63.)

> ### 2.      Testimony from the Child's Nanny

At the bench trial, the Father called as a witness Aleyda Lizardo Paola, who was previously

employed by the Mother and the Father in Honduras as a live-in nanny to the Child beginning

when the Child was a little over one-year old.  (Vol. II, pp. 18–20, 25.)  She testified that the

Mother told her that she wanted to get the Child out of Honduras for "safety" reasons, specifically

the incident with the person who purchased her car.  (Id. at p. 23.)  Ms. Lizardo testified (through

an interpreter) that the "initial plan" was

> . . . to travel to Spain.  Uh, to start a new life.  . . . [W]e were going to go, uh, her
> and myself and [the Child].  And I was going to take care of the [C]hild and [the
> Mother] was going to work, and everything was going to be the same like it was at
> home.

(Id.)

When asked whether "those plans change[d]," Ms. Lizardo answered yes and explained:

"[W]ell, I didn't travel.  So [the Child] went with [the Father], and [the Mother] went to Spain.  So

I didn't care for the [C]hild."  (Id.)  When asked how she knew that the "plan" had changed, she

explained, "Because the [Child] didn't come back with [the Mother], and the trip was canceled

and so . . . I couldn't take care of the [Child] if . . . she wasn't with her Mother."  (Id. at p. 25.)  No

one ever told Ms. Lizardo that the plan was for the Child to live in the United States permanently,

and while she knew the Child "[was] with [the Father]," she did not get a "sure answer" and did not think it was "confirmed" that the Child was going to be *living* with the Father.  (Id. at p. 26.)

### 3.   The Father's Testimony

As discussed throughout the previous subsections, the Father testified that the plan has always been to have the Child move to the United States to live with him and attend school.  After initially testifying on cross-examination (called by the Mother) on the first day of the trial, the Father took the stand a second time for direct examination immediately after Ms. Lizardo testified, and his testimony seemed to shift to account for Ms. Lizardo's testimony.  On direct examination, the Father testified that "[t]he moment [the Mother] called [him]" (presumably about the buyer of her car having been kidnapped), he "told" the Mother, Ms. Lizardo and the Child "to go to Spain" because "[i]t was the only country where all three of them could fly immediately [from Honduras] without needing visas."  (Id. at p. 47.)  The Father said those plans changed at some unspecified time, and the "new arrangement" was for the Father to "fly in to grab [the Child] and take her with him first to Jamaica, then to the United States," for Ms. Lizardo to remain in Honduras, and for the Mother to go to Spain.  (Id. at p. 48.)  He added that, "[t]hen we would try to go towards the end of October to December for one month to Spain so . . . the [C]hild could see [the Mother] and stay with her for a month."  (Id.; see also id. at p. 59.)  He testified that the Mother consented to him leaving Honduras with the Child for the purposes of residing with him, characterizing "that agreement" as "a culmination of things that [he] and [she] had done before" beginning in 2018.  (Id. at pp. 48–49.)  Later during his direct examination, the Father said that he recommended that he come to Honduras and take the Child with him while the Mother "travel[ed] to Spain by herself" because he has moved to different countries "a lot" and knows that it is "not an easy experience," so he did not think it was a "good idea" for the Mother to try to move with a minor child in tow.

(Id. at p. 99.)  According to the Father, the Mother agreed, so he "then . . . said, ['O]kay, then [the Child] can come live with me and then we'll go visit you in Spain.[']"  (Id.)

### 4.    Testimony from the Child's Aunt

Giovanna Repich, who is the Mother's sister, lives in Miami and communicated with the Father while he and the Child were in Miami in late 2020.  (Vol. I, pp. 51–52.)  She testified at the bench trial that her understanding was that the Child was supposed to spend one month with the Father and was to then be returned to the Mother.  (Id. at pp. 56–57.)  Ms. Repich testified that she offered to assist the Father with Child's return by traveling with the Child to get her back to the Mother.  (Id. at p. 57.)  The Father told Ms. Repich that his reason for not returning the Child to the Mother was his fear of putting the Child at risk of contracting COVID-19 during a flight.  (Id.) Ms. Repich also testified that, in December 2020, she asked the Father for an address where she could send Christmas gifts for the Child, and the Father provided her with an address in Miami. (Id. at pp. 52–55.)  Lastly, Ms. Repich also testified that her understanding was that her sister went to Spain and applied for temporary residence there "[u]nder the threat that [the Father] was not going to return her daughter unless she did [so]."  (Id. at p. 63.)

### E.    Travel Authorization for August 2020

On August 7, 2020, the Mother signed a travel authorization that had been drafted by the Father's attorney.  (Id. at pp. 181–83.)   The Mother testified that the Father's attorney brought the document to the Mother's home for her to sign and her own attorney was not present.  (Id.)  The Mother felt like it was an "emergency" since the Father was scheduled to leave with the Child within a few days.  (Id.)  The parties have presented slightly different proposed translations of the August 2020 travel authorization (the original of which was drafted completely in Spanish).  (See P. Ex. 1 & R. Ex. 2.)  Petitioner asserts that the relevant language should be interpreted to say: "I[,

[the Mother,] . . . AUTHORIZE the exit of this country for my minor child . . . and heading to the country of the United States of America on August 17, 2020.  . . . I request the Migration Authorities *allow the exit and entrance of my minor daughter* . . . ."  (P. Ex. 1, p. 3 (emphasis added).)   Respondents' translation, however, interprets it to say: "I[, the Mother,] . . . AUTHORIZE my youngest daughter . . . to leave this country to the country of the United States of America on August 17, 2020.  . . . I request the immigration authorities to allow my youngest daughter *to enter and leave this country* . . . ."  (R. Ex. 2, p. 2.)  The Court notes that, despite the fact that the parties seem to agree that an authorization is only needed for a child to exit Honduras, both translations appear to request that the immigration authorities allow the Child to enter Honduras in addition to exiting it.   Regardless, the parties agree—and both interpretations indicate—that the document did not provide a date that the Child was expected to return. According to the Mother, "[t]here was no return date because we were in the middle of the pandemic, and [the Father] requested that there would not be a return date.  He didn't want this to be an issue, a legal issue."  (Vol. I, p. 181.)  She also acknowledged that another reason the document did not mention returning the Child to Honduras was because she and the Father had agreed that she would be moving to Spain.  (Id. at p. 183.)

The Father testified that the travel authorization was prepared by both parents' attorneys. (Id. at p. 147.)  He said that the wording meant that the Mother authorized the Child's exit from Honduras and the Child's entry into the United States.  (Id. at p. 146.)  He claimed that the travel authorization did not have a return date because the Child was "never going to return to Honduras" and the Mother was leaving Honduras for Spain.  (Vol. II, p. 58.)

### F.      Conversations between the Parties through Messaging and Email

On August 7, immediately after signing the travel authorization, the Mother messaged the Father using the WhatsApp messaging platform, demanding that he tell her the date when he would return the Child to her.  (J. Ex. 7, p. 6.)   In the message, she said she had noticed that the authorization did not have a return date but she "signed it [anyway] because [she] did not want to fight."  (Id. at p. 6.)  The Father's responsive messages to the Mother contradict his testimony that he and the Mother had agreed that the Child would live with him permanently in the United States. He first messaged that he was unable to set a date because the Mother had not given him the date she would be in Spain "or anywhere else."  (Id.)  The Mother then told him that she would be in Spain on September 4 and asked again for a date when he would return the Child to her, noting that she did not trust him.  (Id.)  The Father responded: "When you tell me you can receive her." (Id.)  When the Mother then said, "On September 5," the Father began posing hypotheticals to her: "What if I can't travel that date?" and "What if they close Spain [or Jamaica] at that time?"  (Id.) In response, the Mother commented that "[t]his is very convenient after I signed [for the Child to leave].  We're going with the timeline . . . a month and a half is yours correct?  Because it was one month in August and 2 weeks in April?"  (Id.)  She then proposed that the Child be returned to her on September 17, to which the Father replied, "We'll see . . . .  [W]e can't place an exact date [b]ecause at this time there aren't set dates for anything."  (Id. at pp. 6–7.)  After a few more exchanges, the Father posited: "I don't have a ticket [to fly the Child to] Spain[.]  And what happens if later they don't let you return to Spain?  Or they don't let you stay[?]  Or they have another lockdown[?]  And I can't leave [the Child] there for a month."  (Id. at p. 7.)  In response, the Mother stated: "If they don't let me in [to Spain] you'll return her to me in Honduras.  I don't care where if in Spain or Honduras, I want a date . . . of when you're going to give [the Child]

back to me." (Id.)  The parties continued to exchange similar comments and queries, with the Mother demanding a return date and the Father telling her he could not guarantee a set date given uncertainty about availability of flights at a later date. (Id. at pp. 7–8.)  When the Mother offered to allow the Father to give her a written estimate of time, and not necessarily a specific date, he responded only that: "I cannot sign a return date [t]hat I cannot guarantee [b]ecause then if for whatever reason I can't return her[,] I will be in violation . . . [a]nd a judge could not endorse our agreement." (Id. at p. 8.)

Over the course of the next several days, the parties continued to have similar conversations that all evince an intention for the Father to return the Child to the Mother but a dispute about the date of the return.  For instance, on August 9, the Mother again requested a return date, to which the Father said, "[W]hen you have residency [i]n Spain[,] i.e., housing[,] . . . *I'll leave [the Child] with you*." (Id. at pp. 8–9 (emphasis supplied).)  The Mother objected again to his failure to give a more precise date. (Id. at p. 9.)  In an August 10 message, the Mother commented,

> [E]ver since I made the decision that [the Child] would grow up in Spain you have done nothing besides be negative and [have] given zero support[.]  I do not want to leave my country.  I love my country[.]  I am comfortable in my country.  But I sold the car and come to find out the person I sold it to was kidnapped and may be dead[.]  But if this is your response to tell me that you are not going to return [the Child] to me until I have housing then I will consider not leaving instead.

(Id.)  The Father did not respond. (See id.)

On August 11, the Mother sent an email to the Father saying she had signed the authorization in good faith and still needed an answer about the "return delivery of the minor." (J. Ex. 3, p. 6.)  She noted, "If the delivery is in Honduras or Spain, this should not be a problem for you, I will be in Madrid from September 4." (Id.)  Having still not received a response, the Mother emailed on August 12 that she "will be waiting for a signed document as without one there will be no assurance of the minor's return." (Id.)

20

The record does not indicate that the parties exchanged any additional message or emails between August 13 and August 17, the date the Father picked the Child up in Honduras.  It is undisputed, however, that the Father and the Child flew from Honduras to the United States on August 19, and then flew to Jamaica on August 21, where they were joined by Ms. Brooks.  (Vol. I, pp. 106, 133–34, 216.)  The Father, Ms. Brooks, and the Child remained in Jamaica until November 14, 2020 (when they all flew to the United States).  (Id. at pp. 106, 216.)  Meanwhile, on or around September 11, the Mother left for Spain.  (Id. at pp. 148, 186.)  According to her testimony, she entered Spain on a tourist visa.  (Id. at p. 170.)  She took the Child's dog with her and signed a lease for an apartment in Spain.  (Id. at p. 169; Vol. II, p. 94.)

The next written communication exchanged between the parties that is in the record before the Court is a September 13 WhatsApp message where the Mother told the Father: "[Y]ou need to return [the Child] to me at the end of September like we agreed[.] . . .  At the end of September it'll be [a] month and a half.  . . .  End of September I don't care who brings her that's what we agreed on ok?"  (J. Ex. 8, p. 5.)  The next day, the Father responded, saying that since the Mother had threatened legal action against him and since the Child is "now under [his] care," communications will be made through his lawyers.  (Id. at p. 6.)  The Mother replied: "Perfect. Let's make it clear you don't want to return [the Child] to me.  . . .  When you say [the Child] is under your care? Are you taking my daughter's custody from me?"  (Id.)

According to documentation jointly admitted by the parties, the Mother applied for temporary residence in Spain on September 29, 2020.  (J. Ex. 51.)  This request was ultimately granted for the period of December 4, 2020, through December 3, 2025, and the Mother was directed to obtain a "foreigner identity card."  (Id.)

The next written exchange between the parties in the record is an email sent by the Mother on October 6, 2020, wherein she wrote to the Father that their signed settlement agreement provided "that the entire month of August was yours and 2 months [sic] in April were your visitations with the minor and it not being realized during the pandemic, you requested the time starting from when you left for her August 18.  We are on October 06 and you [s]till have not given me a date for the return of the minor."  (J. Ex. 3, p. 5.)

On October 12, 2020, the Father sent the Mother an email, cc'ing his own attorney, which provided:

> [A]s of September 2020, I will stop sending money to cover the [C]hild's expenses since she is now living with me, and I am supporting all [her expenses].  However[,] I will make a reimbursement of three thousand dollars (US$3,000) in the month of October to settle any expenses that may be pending from [the Child] due to the change of residence.

(J. Ex. 5.)

Next, the record contains an October 22, 2020, message sent by the Mother to the Father asking if he had a date for the return of the Child.  (J. Ex. 7, p. 10.)  The Father responded only by stating that he read in the newspaper that Madrid was closed and Spain had reached one million cases (presumably of COVID-19 infections).  (Id.)  In reply, the Mother advised that she would be sending "one more email" asking when he is returning the Child to her.  (Id.)  Consistent therewith, the record contains an email sent on that same day by the Mother to the Father, an individual named Gandhi Mejia who was the Father's attorney at that time, and the Mother's own attorney, asking "to know the date that [the Father] is going to return the minor to her mother."  (J. Ex. 3, p. 5.)  She again referenced the Settlement Agreement, saying it gave the Father one month and two weeks of visitation.  (Id.)  She noted that the minor, at that point, had been with the Father for three months and that the Father was refusing to "indicate a return date due to the risk of exposing [the Child] to the virus, [despite the fact that] he has put her in danger before by taking her out of

Honduras, and staying in Miami." (Id.)  She asked for cooperation on the return of the Child and

stated her willingness to arrange to pick the Child up in Jamaica, to have her sister pick the Child

up in Jamaica and bring her to Spain, or to pick the Child up in Panama because there were direct

flights there from Jamaica.  (Id.)

The Father replied to the Mother and the other recipients of this email the same day, stating

that the Child was currently living with him in Jamaica and adding:

> We agreed to remove [the Child] from Honduras due to the risk caused by the global
> pandemic as well as due to your selling of a vehicle to a presumed drug dealer who
> is currently being searched for.  [This] revokes the initial [settlement] agreement
> since neither you nor the [C]hild reside there.  And as was reflected in the
> permission, signed before a notary without a return date, to remove [the Child] from
> Honduras.  Due to [COVID-19-related travel issues in Jamaica and Spain], we are
> not going to do any trip at this moment that puts the minor at risk.  When the
> situation gets better we will travel to Spain so you can see her . . . .

(Id. at p. 4.)  He also stated that he was attaching confirmations of "the transfer of reimbursement

for the expenses for the apartment."  (Id.)

That same day, the Mother replied to the Father and his attorney, Ms. Mejia, and denied

having agreed that the Child was going to live with the Father in Jamaica, noting, "You never

consulted with me on my opinion." (P. Ex. 2, p. 13.)   She ended this email by stating, "if by the

beginning of November the minor has not been returned to Madrid with her mother, I will take it

to mean that you do not want to return her to me and I will need to proceed down a different route."

(Id.)  That same day, the Mother also sent the Father a WhatsApp message that said: "Excuse me

Jaime when did we agree that [the Child] was going to live with you? I would NEVER agree to

that." (J. Ex. 7, p. 10.)  The Father did not respond to this message.  (See id.)

Two days later (on October 24), the Mother sent the Father a message via WhatsApp, where

she wrote: "[P]lease it is time you return my daughter to me, you're taking my time with her.  . . .

This is ridiculous[.]  . . .  [Y]ou've had 3 months and it was only one month and a half.  I know

you don't want to return her to me but this is not what we agreed to.  I have the document signed by you." (<u>Id.</u> at p. 10.)  The Father did not respond to this message.  (<u>See</u> <u>id.</u>)

On October 29, the Mother sent the Father another email, repeating her position that, pursuant to the parties' verbal and written agreements, the Child should already have been returned to her, and again stating her willingness to travel to where the Child is to retrieve her.  (J. Ex. 2, p. 13.)  Ms. Mejia, the Father's attorney at the time, responded to the Mother via email that same date.  (<u>Id.</u> at p. 12.)  The Father was cc'ed on this email, in which the attorney wrote that, due to the pandemic "any return plan has been halted due to reasons beyond [the Father's] control."  (<u>Id.</u>)  She also vaguely (and confusingly) referenced "the issue of [the Child's] residency in the [United States]," stating her concern that if the Child traveled to Europe, she might not be allowed to return to the United States which would put her "migration process at risk as said processes are currently halted."  (<u>Id.</u>)  The attorney also stated that "[a]nother reason I have avoided the exchange is that the airlines in Jamaica do not have direct flights to Spain, all have to make stops in the United States and with the previously mentioned, if [the Father] proceeds to travel with the [C]hild to the United States, he will not be able to return to Jamaica and he would put both of their migration process[es] at risk as well as his job."  (<u>Id.</u>)

The Mother responded via email that same day, October 29, and stated that, before she signed the authorization for the Child to leave Honduras, Ms. Mejia and the Father had verbally assured her that the Child would be returned to her.  (<u>Id.</u> at pp. 11–12.)  The Mother also offered to travel to Jamaica to retrieve the Child, noting that the Child had already traveled into the United States and then into Jamaica when the Father took her from Honduras.  (<u>Id.</u>)

Ms. Mejia sent the Mother a response the following day, again copying the Father on the email.  Therein, Ms. Mejia stated that she and the Father had "never failed to keep [their] word

regarding the return of the minor to [the Mother's] custody . . . [b]ut situations outside of [the Father's] control have stopped this from happening." (Id. at p. 11.) Ms. Mejia then added: "I am sure once we resolve these impasses you will have your daughter as the guardian mother." (Id.) At the end of the email the Father's attorney stated: "I remind you both that in the agreement you both signed you gave consent to execute everything for [the Child's] migration Process, which is what is presently being realized in this moment, and that in every event, the custody of the minor belongs to you Andrea." (Id.)

The Father now argues that Ms. Mejia was not authorized to make these statements on his behalf, and that what his attorney was saying was not accurate; however, he never communicated such to the Mother, despite being copied on his attorney's emails, and he included his attorney on emails to the Mother both before and after this exchange.[6] (See Vol. I, pp. 212–14.)

---

[6] At trial, Respondents objected to the admission and consideration of the emails from Ms. Mejia, claiming the emails were hearsay. (Vol. I, pp. 127–133.) The Mother responded that, pursuant to Federal Rule of Evidence 801(d)(2), the emails were not hearsay because Ms. Mejia's statements were made by her as the Father's agent within the scope of their relationship. (Id.) Respondents replied by denying that Ms. Mejia was authorized to make such statements on the Father's behalf. The Father testified that, immediately after Ms. Mejia sent the October 29 email, he called and texted her to tell her she had made statements that "were not approved, authorized or in agreement with anything that [they had] been doing previously" and to "ask her to please never again send a communication without [his] authorization or approval." (Vol. II, p. 88.) Respondents also presented a copy of an email that the Father sent to Ms. Mejia on November 6, 2020, where he stated, "[f]rom this point, all communications with [the Mother] [regarding] the child will be through attorneys . . .  I am asking you to please contain yourself from continu[ing] to communicate with her, except on my petition." (R. Ex. 3.) The Father claims his statements to Ms. Mejia—made after she sent the at-issue emails to the Mother—prove that she was not authorized to make the statements she made in the emails.  He also testified that he removed Ms. Mejia from the email chain between him and the Mother so that the attorney would not be a party to any email communications going forward. (Vol. I, pp. 143–44.)  The Court overruled the hearsay objection and permitted the introduction of the emails sent by Ms. Mejia to the Mother, citing Federal Rule of Evidence 801(d)(2)(B), (C), and (D), because it appeared the attorney, who was the Father's agent, was authorized to make the statements on behalf of the Father at the time that she sent the emails and, by not immediately making his objections to the emails known to the Mother, the Father had "manifested that [he] adopted or believed to be true" the statements in the email. (Id. at p. 131–32.)  Indeed, pursuant to Federal Rule of Evidence 801(d)(2)(C), an attorney's statement made in a representational capacity can be considered an admission against the attorney's client falling outside of the definition of hearsay.  Hanson v. Waller, 888 F.2d 806, 814 (11th Cir. 1989); Dareing v. Bank of Am. Corp., No. 1:14-CV-1525-RWS-LTW, 2016 WL 7839427, at *7 n.3 (N.D. Ga. Aug. 8, 2016), report and recommendation adopted Dareing v. Bank of Am., N.A., No. 1:14-CV-1525-RWS, 2016 WL 7888019 (N.D. Ga. Sept. 15, 2016) ("The letter by Plaintiff's then-counsel is not hearsay because it is an

On November 14, the Father sent the Mother a message via WhatsApp, stating that he, Ms. Brooks, and the Child were going to the United States and noting that "they have now accepted the offer to buy our house," and that he and the Child "will be there tomorrow." (J. Ex. 32; Vol. II, p. 79.) The Father did not specify where in the United States he, Ms. Brooks, and the Child were going or where the house he was buying was located. The Mother responded by stating that the Child could not leave Jamaica, to which the Father stated, "you can't do this, the [C]hild is a

---

admission of a party opponent."). The statements made by Ms. Mejia were made in the scope of her representation of the Father and were directly related to the management of matters in which she represented the Father, including his and the Mother's custody dispute pending in the Honduran court in which Ms. Mejia was the Father's attorney, as well as the related travel authorizations which Ms. Mejia had drafted for the Father. It is incredulous for the Father to argue otherwise now, when he himself copied Ms. Mejia on emails he sent to the Mother at this time. The Father's after-the-fact email to the attorney does not change this calculus as: (1) his email was sent well after Ms. Mejia's statements were made; (2) his email does not disavow Ms. Mejia's representation but instead confirms that the communications will be "through the attorneys;" (3) he continued to include Ms. Mejia on some communications with the Mother after his email to Ms. Mejia; and (4) he did not copy the Mother on his email to Ms. Mejia or otherwise communicate to the Mother that he did not authorize Ms. Mejia to speak for him. Indeed, the Father testified at his deposition that Ms. Mejia continued to represent him until the Mother filed this action in the United States. (J. Ex. 17, p. 38.) Further, by failing to respond to Ms. Mejia's emails (on which he was copied) or otherwise communicate his disagreement with Ms. Mejia's statements to the Mother, the Father manifested his adoption of the attorney's statements. See Anderson v. Blake, No. 7:11-CV-42 HL, 2012 WL 2405990, at *3 (M.D. Ga. June 25, 2012) (failure to reply under circumstances which reasonably call for a reply constitutes an admission by silence under Fed. R. Evid. 801(d)(2)(B)). Moreover, as explained by the Court at trial, Ms. Mejia's emails also have evidentiary value even if the Court does not consider them for purposes of the truth of the matters asserted by the attorney therein. (Vol. I, p. 132.) Ms. Mejia's emails are relevant to demonstrate the effect that her statements (as the Father's attorney) had on the Mother, and the statements help explain the actions the Mother took after receiving these emails. Further, these emails are part of the course of conduct and communications between the Mother and the Father regarding the Child, as they were both copied on these emails, and the Mother directly participated in the email conversation before and after these emails. For instance, the emails demonstrate that, in the face of the Mother's statement that the attorney and the Father verbally assured her—at the time she signed the travel authorization—that the Child would be returned to her, neither Ms. Mejia nor the Father voiced any disagreement with the Mother's statement. Additionally, even if the attorney was mistaken as to the Father's intentions regarding the Child, these emails demonstrate the attorney's understanding of the parties' agreement regarding the return of the Child to the Mother. If the Father's own attorney—who was integrally involved in the parents' disputes and communications, who drafted the travel authorization (or least assisted in its drafting) on the Father's behalf, and who was aware of the Father's efforts to obtain residency status for the Child—believed that the Father intended to return the Child to the Mother's primary care and "that in every event, the custody of the minor belongs to [the Mother]," it was certainly understandable for the Mother to believe the same. Regardless, even if the Court had sustained the Father's objection and not considered the emails from Ms. Mejia, the record contains more than ample evidence, absent the attorney's statements, to find in favor of the Mother and grant her Petition.

resident of the states." (J. Ex. 32; Vol. II, p. 79.)  The same day, the Mother also sent Ms. Brooks an electronic message stating that the Child was not allowed to travel out of Jamaica and asking for assistance in having the Child returned to her.  (Doc. 1, p. 40.)  Ms. Brooks refused to assist the Mother and responded that the Mother's issues with the Father were for the Mother and the Father to solve and that "everything we do is according to the law and in [the Child's] best interest." (Id.; Vol. I, pp. 218–19.)

On November 14, the Father sent his first email to the Mother since his attorney's email on October 29.  (P. Ex. 2, pp. 10–11.)  Notwithstanding his testimony and argument that his attorney was not authorized to participate in conversations with the Mother and that he had removed her from all emails going forward, the Father copied the attorney on this email.  (Id.)  In the email, he stated that the Child "has residency in the United States with her father (me) and we have authorization[;] there is no need to request it again.  I am simply notifying you so you are aware we are returning to the United States." (Doc. 96-2, pp. 10–11.)  In response, on the same day, the mother replied via email: "I DID NOT GIVE AUTHORIZATION FOR THIS!!!!" (Id. at p. 10.)

On November 15, the Father sent the Mother an email advising that he and the Child were in the United States and "doing well," and he provided a Miami address for himself and the Child. (J. Ex. 33.)  In response, the Mother sent an email on November 18 stating that she did not authorize or consent to the Child's travel from Jamaica to the United States and asserting that the Father has been wrongfully retaining the Child.  (R. Ex. 2, p. 10.)  She noted that the Father, who had been citing the dangers of COVID-19 as an excuse not to travel to return the Child to her, had now flown internationally with the Child.  The Father responded on the same day, stating:

> As discussed previously, the agreement that we signed in which you had the Guardia (Control) of [the Child] while being in Honduras, only applied when you

and [the Child] resided in Honduras due to the laws of that particular country[.] [Y]ou and [the Child] do not reside there and the laws of the international convention apply where she is my child as well, not to mention that you broke said agreement when you did not give [her] to me in April. . . . I have also let you know in both writing and verbally that we will travel to Spain when it is safe and legal for us to do so. . . . So as discussed previously as soon as it is safe and legal for [the Child] and I to travel to Spain, we will do so.

(Id. at pp. 9–10.)  The Father claims that, while still in Miami, he told the Mother's brother that he and Ms. Brooks and the Child were going to Savannah, but his testimony on this was inconsistent and inconclusive and thus cannot be given any serious weight.  Moreover, there is no evidence that he requested or expected the brother to relay this information to the Mother.  Regardless, after being in Miami for about a week, the Father, Ms. Brooks, and the Child traveled to Savannah, where they stayed for approximately one week before returning to Miami for several days and then returning again to Savannah.  (See Vol. I, pp. 102–03.)  While the specific dates that the group were in Miami and the dates they were in Savannah remain unclear, the Father testified that their final return to Savannah occurred sometime—perhaps as early as three weeks—prior to December 19, when they moved into the home he had purchased there.  (Id. ("And then we traveled back to Miami a week later, then traveled back to Savannah, then back to Miami and then back to Savannah."); Vol. II, pp. 75–76 ("And then we drove back up to Georgia to do the whole process of actually buying the house[.] . . . We stayed at an Airbnb for the next three weeks, and then we took possession of the house December 19th.").)

On December 14, the Mother emailed the Father asking him to please provide the current address for the Child because she noticed that the Child's location had been changing.  (P. Ex. 2, p. 2.)  The Father's reply on the same day stated only: "You have [the Child's address]."  (Id.)  In WhatsApp messages exchanged between December 18 and December 23, the Mother repeatedly asked for the Child's address, to which—despite having recently relocated to Savannah—the Father responded only: "You know the address."  (Id.)  The Mother replied to this by asking, "So

you are telling me [the Child] is still in [Miami] with your uncle?"  (Id.)  The Father apparently did not respond.  (Id.)  Even according to the Father's own testimony (which, for reasons stated below, the Court does not credit), he did not give the Mother the Respondents' address in Savannah (where they were keeping the Child) until sometime in January 2021.  (Vol. I, p. 137.)

Respondent Lauren Brooks, who described herself as the Father's "partner" and who has been traveling and living with him (and now with the Child) for some time, testified that the Father told her that his legal counsel had advised that they not talk to the Mother or tell her where they were.  (Id. at pp. 219–22, 226–28.)  Accordingly, even when Ms. Brooks learned that the Mother had begun posting on social media, stating that she did not know where the Father and the Child were residing and asking for help in locating the Child, Ms. Brooks declined to give the Mother this information, though she also testified she believed the Father disclosed their address to the Mother at some point.  (Id. at pp. 219–21, 223–24.)

On January 14, 2021, the Mother left Spain and moved back to Honduras.  (Id. at p. 196.) She testified that an attorney with the children's services department in Honduras advised her to return to Honduras in light of her Hague Convention proceeding, but she also explained that "either way, [she] was going to return [to Honduras] because of the reason that [the Child] was not with [her]."  (Id. at pp. 196–99.)  She added, "I was not doing anything in Spain without her.  So I had to return to my country."  (Id. at p. 197.)  When asked whether she intends to relocate to Spain again if and when the Child is returned to her, she answered, "I don't think so, no."  (Id. at p. 199.)

### G.    Evidence Relating to Father's "Grave Risk of Harm" Defense

The Father claims that he is concerned about the Mother's mental health and he therefore believes that the Child will be in danger if she is returned to the Mother in Honduras.  He says she has "sudden mood swings" and at times exhibits "strange behaviors."  (Vol. I, pp. 108–09.)  The

Father testified that his relationship with the Mother has been "difficult" because the Mother "has a tendency to change her mind repeatedly and to have very consistent ups and downs." (Vol. II, p. 38.)  One example he gave was that she would agree with him on something regarding the Child and would be enthusiastic about it but then a few days later she would call him bad names and say he was a bad dad because he did not answer her phone call while he was working. (Id.)

The Father testified that the Mother has been diagnosed as bipolar. (Vol. II, p. 100.) During the trial, however, the Mother was never asked whether she has been diagnosed as such, and the only credible evidence presented to the Court on this topic was the Mother's testimony that, in March 2017—immediately after the death of her father and less than a year after the death of her mother—the Mother sought treatment from a psychiatrist and was prescribed medications that treat, among other things, bipolar disorder. (Vol. I, pp. 199-200, 210.)  She stopped taking those medications several months later when she learned she was pregnant with the Child. (Id. at p. 199.)  She is not presently being treated for any mental health issues, and she has never been told that she should have continued or resumed taking those medications. (Id. at pp. 200–01.)

The Father provided testimony about an incident in July 2017—before the Mother was even known to be pregnant with the Child—where the Mother, after drinking heavily, attacked the Father with a pair of scissors.[7] (See Vol. II, pp. 8–17, 119–122.)  The Father's witness, Shirly Ferrer de Monzon, testified that, on the night in question, after a night of drinking at a bar, she, the Mother, and the Father returned to the Father's residence and eventually the Father and the Mother argued over the Father's requests that the Mother come to bed. (Vol. II, pp. 9–11.)  The Mother and the Father eventually went to the Father's bedroom and continued to argue. (Id. at p. 11.)

---

[7]  The Father also testified that the Mother has, on two occasions, jumped from a moving vehicle, but he did not provide evidence that either incident occurred since the time she became pregnant with the Child. He also did not explain the circumstances surrounding these incidents. (Vol. I, pp. 106–07.)

Though the witness did not see what occurred inside the bedroom, she heard "screaming and noises coming from inside the room." (Id.)  The witness went to bed, and approximately forty minutes later she heard more noises, and the Father and the Mother came out of the room and the witness saw that the Father's back was bloodied, and the bedroom was "all torn apart" including a broken chair. (Id. at pp. 11–12.)  The Father told the witness that the Mother had grabbed some scissors and started to cut him on his back. (Id. at p. 12.)  The witness also testified that the police were called to the scene and that the Mother admitted she had picked up the scissors and hit the Father and the Father told the police that he was asleep when he started to feel like he was being "knifed in the back." (Id. at pp. 12–13.)   On the other hand, during the trial, the Mother testified that she had grabbed the scissors off a bedside table and used them only in self-defense because the Father had pinned her down on the bed and was choking her. (Vol. I, pp. 201–02.)

The Father did not present any evidence that the Mother has been violent toward the Child, or even toward him or anyone else since this incident approximately four years ago.  When Ms. Lizardo, the live-in nanny, took the stand, she testified that the Mother has never yelled at her and she has never witnessed the Mother yell at other people. (Vol. II, p. 21.)

The Father also claimed that the Mother frequently allows the Child to ride in the car without being fully secured in a child safety seat.  During the trial, the Mother denied believing it is acceptable for the Child to ride in a moving car without being properly restrained in a car seat. (Vol. I, pp. 202–203.)  The Mother was shown various photos of the Child not completely strapped into her car seat, but she testified that all but one of the photos depicted situations where the car was stopped and was not moving or where the car seat was being used as a carrier and was not

actually inside a vehicle at the time the photo was taken.[8]  (Id. at pp. 203–04.)  Ms. Lizardo testified that the Father talked with her about the Child being buckled into a car seat and that "she was always buckled in."  (Vol. II, pp. 21–22.)  She stated she could only recall one instance where the child was not restrained in a car seat when she and the Mother were out with a member of the Mother's family.  (Id.)

The Father has never previously filed anything with any court or other agency raising concerns about the Mother's mental health or alcohol use or questioning whether the Child is safe when in her care in Honduras.  (See Vol. I, pp. 73–74, 107–08.)

The Father also alleges that the Child faces a grave risk of harm due generally to violence in Honduras.  In support, he presented evidence that the Mother's father was murdered (in March 2017) in Honduras, that her uncle was shot (in October 2016) in Honduras, that she has friends who possibly were murdered in Honduras (at undisclosed times), that she drove an armored car (provided to her by the Father) after the Child was born, and that she and the Child were once witnesses when individuals shot and killed the occupants of a vehicle adjacent to the Mother and the Child's vehicle.  (Vol. I, pp. 206–07; J. Exs. 56, 57.)  The Father testified that he has lived in numerous countries and he believes Honduras to be the most dangerous of all of them.  (Vol. II, pp. 40–41 ("I've never felt more endangered anywhere than in Honduras, because it didn't matter even if you played safe, if you were in the wrong place at the wrong time.").)

**H.    Parties' Credibility During Trial Testimony**

A bench trial affords a trial court an opportunity to observe the parties and their witnesses and to gain perspective and insight into each party's respective credibility, which a review of

---

[8]  The Mother admitted that one photo, where the Mother is shown holding the child while breastfeeding her in the backseat of the car, (see doc. 98-63, p. 5), did depict an instance where the child was not strapped in while the car was in motion.  (Vol. I, p. 203.)

transcripts and documentary evidence does not typically afford.  See Bates v. U.S. Gen. Servs. Admin., 695 F. App'x 429, 433 (11th Cir. 2017) (noting after bench trial that appellate court would "accord great deference to the trial court's credibility determinations, as 'the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses'") (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); Fed. R. Civ. P. 52 (when reviewing trial court's findings of fact following bench trial, "reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility").  During the trial of this case, the Court found the Mother to generally be a more credible witness than the Father and Ms. Brooks.  The Father, particularly on cross examination but even at times on direct examination, frequently offered deflection and obfuscation rather than straightforward responses.  He was often defensive and appeared to be thinking about crafting answers that would best fit his theory of the case rather than directly responding to what was asked of him.  Respondent Ms. Brooks was clearly nervous and exceedingly reluctant to testify, and it appeared that she frequently looked at the Father for approval of her answers.  The Mother, on the other hand, provided straightforward responses and answered questions honestly even when the information asked of her would seem to cut against her.  For instance, though the Father seemed to come up with new reasons to question the Mother's parental fitness each time he testified,[9] (see, e.g., Vol. II, pp. 122–23), when the Mother was asked whether the Father had any deficiencies as a parent other than having abducted the Child, the Mother responded, "[n]ot at all," (Vol. I, p. 207).

---

[9]  As another example, during his deposition, the Father testified, "[I]f I were to name every incident regarding [the Mother's] mental health, we would need 120 pages." (J. Ex. 17, p. 46.)  When asked about this testimony on cross-examination during trial, however, the Father admitted that "it was an exaggeration."  (Vol. I, pp. 109–10.)

In addition to their demeanor when testifying, the evidence surrounding their testimony also generally cuts against the Father and Ms. Brooks' credibility.  The Court has pointed out some of the contradictions with the Father's testimony above and discusses several contradictions more fully below.  However, some examples bear mentioning in order to demonstrate the Court's general skepticism toward the Respondents'—and particularly the Father's—testimony.

The Father and Ms. Brooks provided shifting and inconsistent testimony on the issue of whether the Father told the Mother that they had moved with the Child to Savannah.  At his deposition, the Father repeatedly dodged questions on this issue.  (J. Ex. 17, pp. 35–37, 40–41, 74.)  At times during the deposition he seemed to testify that he had not told the Mother that they were moving to Savannah and had not given the Mother his Savannah address, (id. at pp. 35, 37); at other times he testified that he did not recall whether he had informed her of the Savannah address, (id. at pp. 35–37); at other points he deflected the question by stating that the Mother had not asked for the Child's address, (id. at pp. 40–41); at still other times he stated that he did not communicate with the Mother once he arrived in the United States except through his attorneys, (id. at pp. 36–37); and he also testified that the Mother told him she found the address in February 2021 with the assistance of a private investigator, (id. at p. 41).  When testifying at trial, the Father suddenly remembered that he had given the Mother his Savannah address over the phone in January 2021 and that he had told the Mother's family of the move to Savannah.  (Vol. I, pp. 137–38.)  Ms. Brooks testified that she was aware from social media posts that the Mother was looking for the Child in January of 2021, and she admitted that she did not take any actions to notify the Mother of the Child's whereabouts.  (Id. at pp. 219–21.)  However, Ms. Brooks' testimony as to why she did not let the Mother know of their location and as to whether the Father had communicated their location to the Mother was foggy at best.  (Id. at pp. 226–28.)  Ms. Brooks

also testified that she mentioned to the Mother's brother that she and the Father would be in Savannah for Thanksgiving in November of 2020, but, when pressed, she could not recall the specifics of the conversation.   (Id. at pp. 223, 228–29.)   In contrast, the Mother testified consistently both during her deposition and at trial that she did not know that the Father had moved with the Child to Savannah until a private investigator informed her of the Child's whereabouts on approximately February 11, 2021.  (J. Ex. 16, p. 39; Vol. I, p. 158.)

The Mother's testimony on this point is not only internally consistent, it is also corroborated by other evidence, while the Father and Ms. Brooks' testimony is not only internally inconsistent but also contradicted by other evidence.  The Father's shifting tale that the Mother did not ask for the Child's location or that he informed the Mother of the location is contradicted by, among other things: (1) the electronic messages exchanged between the Mother and the Father from September through December of 2020, where the Mother repeatedly asked for the address and the Father did not provide it, (J. Ex. 8, p. 4); (2) the fact that, when the Mother's sister asked for an address to send Christmas gifts for the Child, the Father provided her with an address in Miami—rather than Savannah, (Vol. I, pp. 52–55); (3) the Mother's use of social media to attempt to locate the child, with no response from Respondents or their attorneys despite the fact that Respondents were aware of the social media efforts, (id. at pp. 157, 220–21; J. Ex. 40); (4) the fact that the Mother's attorneys filed this lawsuit in the Southern District of Florida in January 2021, (doc. 1); and (5) the need for the United States Marshals Service and a private investigator in order to determine the Child and Respondents' actual whereabouts for the purposes of service, (doc. 19; Vol. I, pp. 157–58).

Likewise, the Court finds the Father's testimony that he and the Mother agreed that the Child would primarily live with him in the United States upon his leaving Honduras in August of

2020 not credible. Because this issue is so intertwined with the Court's analysis of the parties' claims and defenses, the Court includes a thorough weighing of the Father and the Mother's accounts on this issue below. However, it bears mention here that the problems with the Father's testimony as to this supposed agreement are indicative of the Court's findings regarding his overall lack of credibility. His testimony on the supposed agreement for the Child to live primarily with him in the United States bears all the hallmarks of a fabrication, including shifting descriptions of the supposed events leading to the supposed agreement, a lack of concrete specifics as to how and when the supposed agreement was formed, and a lack of any contemporaneous documentation evidencing the supposed agreement. Like many false tales, the Father's account of this supposed agreement has a veneer of plausibility when viewed only through the lens of the limited set of surrounding evidence on which he focuses. However, the totality of the evidence, including the parents' course of dealing throughout the Child's life, the Settlement Agreement negotiated and executed by the parents and submitted to the Honduran court by the Father's attorney only months prior, the electronic messages between the Mother and the Father at the time of this supposed agreement including the Father's own words (and often telling silence), emails from the Father's own attorney at the time, and the testimony of the Child's live-in nanny (whom the Father called to testify at trial), contradicts this supposed agreement and lays bare the falsity underlying the Father's account.

At bottom, having been afforded the opportunity to observe all witnesses at trial and having reviewed the totality of the evidence in this case, the Court finds the Mother's testimony to be more credible than the Respondents'.[10]

---

[10] The Court stresses that its credibility assessments are solely for the purpose of determining the issues germane to the Mother's Petition. It is not for this Court to decide whether the Father or the Mother are good parents, much less what custody arrangement and living situation is in the best interest of the Child. The evidence before the Court, including the Mother's own testimony, indicates that both the Mother and

## DISCUSSION

"The remedy of returning a wrongfully-removed child to their habitual residence is 'intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings.'" Garcia v. Varona, 806 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011) (quoting Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008)). ICARA permits a person to file a petition for the return of a child in "any court which has jurisdiction of such action . . . in the place where the child is located at the time the petition is filed." Id. at 1309; see also 22 U.S.C. § 9003(b). Likewise, ICARA permits United States courts to "take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of [a] petition [for return under the Convention]." Stromme v. Stromme, No. 17-CV-20847, 2017 WL 11219670, at *2 (S.D. Fla. Mar. 10, 2017) (quoting 22 U.S.C. § 9004(a)). "The inquiry by a Court in a return action under ICARA 'is limited to the merits of the abduction claim and not the merits of the underlying custody battle.'" Garcia, 806 F. Supp. 2d at 1309 (quoting Pielage v. McConnell, 516 F.3d 1282, 1286 (11th Cir. 2008)).

## I. Respondents' Request to Dismiss Ms. Brooks

Prior to delving into the substance of the parties' dispute, the Court addresses whether Ms. Brooks can be held accountable for the alleged wrongful retention of the Child. Respondents argue that "Ms. Brooks should have never been named a party to this case" and that she should be dismissed from the case. (See Vol. I, p. 42.) They emphasize the undisputed facts that Ms. Brooks

---

the Father have been good and involved parents throughout the Child's life. Indeed, it appears that the Father's fabrication of a supposed agreement with the Mother for the Child to live with him is due to the Father's understandable desires to be the Child's primary caregiver and to have the Child live in the United States. However, such determinations pertaining to the Child's long-term situation are not for this Court to make, and they are not for the Father to make unilaterally.

has no rights of custody to the Child, is not the Child's legal guardian, is not a party to any agreement relating to custodial or visitation rights to the Child, and is unable to travel unaccompanied with the Child internationally, and they contend that Ms. Brooks "could not have, and in fact, . . . had no actions relating to this case."  (Id.)

As an initial matter, the Court is not aware of—and Respondents have not cited—any legal authority to support their implication that, in order to be named as a respondent to a Hague Petition, an individual must have some sort of legal rights to the child.  Quite to the contrary, the text of the Hague Convention itself appears to only require that the *petitioner* have custody rights.  See Hague Convention, Arts. 3–4.  Moreover, courts have rejected the argument that only a parent or person with custodial rights can be named as a respondent under ICARA.  See Jacquety v. Baptista, No. 19 CIV. 9642 (VM), 2020 WL 5946562, at *5 (S.D.N.Y. Oct. 7, 2020) ("As an initial matter, the Court is not persuaded that, because [the removing mother's boyfriend] is not a relative or a custodial parent, he is an improper respondent here.   Under ICARA, responsibility for child abduction is nowhere limited to a child's parents or relatives."); Neves v. Neves, 637 F. Supp. 2d 322, 346–47 (W.D.N.C. 2009) (allocating portion of Hague petitioner's fees and costs award against two respondents who "[were] not related to the children and presumably ha[d] no stake in the outcome of the custody case that is currently pending [in the country from which the father removed the children]" but whose "assistance was integral to [the father's] plans" to wrongfully remove and retain the children).  The court in Jacquety explained that the text of ICARA, the Reports of Elisa Pérez–Vera, the official Hague Convention Reporter, and opinions of other courts all supported the conclusion that nonparents who were involved in the wrongful removal or retention of a child were expressly contemplated as ICARA respondents.  Jacquety, No. 19 CIV. 9642 (VM), 2020 WL 5946562, at *5 (citing 22 U.S.C. § 9001(a)(2); id. at § 9002(6); Sanchez v.

R.G.L., 761 F.3d 495, 506 (5th Cir. 2014); Elisa Pérez–Vera, Explanatory Report: Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction ¶ 81; Elisa Pérez-Vera, Report of the Special Commission: Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction ¶ 55). The Court concurs with that conclusion and finds that Ms. Brooks' lack of custody rights or other legal rights as to the Child does not bar Petitioner's claims against her.[11]

Moreover, the Court disagrees with Respondents that Ms. Brooks has played no role in the wrongful retention of the Child.  While Ms. Brooks did not travel with the Father and the Child when they departed from Honduras, she has been with them at least since they arrived in the United States and has been living with them in Miami and now in Savannah.  Ms. Brooks accompanied the Father and the Child on trips between Miami and Savannah.  While Ms. Brooks testified that the Father makes the decisions as to the Child, she has clearly filled somewhat of a parental role during the retention of the Child in the United States.  For instance, she drops off and picks up the

---

[11] Respondents' arguments on this point are vague and are not as extensive as those made by the respondents in Jacquety and the other cases cited herein.  For instance, Respondents have never raised the issue of standing or otherwise provided a legal basis for Ms. Brooks' dismissal.  Because Respondents' legal arguments are not as developed as those made by the respondents in the cases cited herein, this Court's legal analysis on this topic is also not as extensive as the analyses provided by the courts in those cases. Nonetheless, the Court has assessed the issue of standing in this case, including redressability, and finds no jurisdictional defect.  Like the nonparent in Jacquety, Ms. Brooks may play some role in the return of the Child, and given that she played a role in the Child's wrongful retention, she may be liable for at least a portion of other remedies, including payment of Petitioner's costs and fees.  Jacquety, No. 19 CIV. 9642 (VM), 2020 WL 5946562, at *6 ("[W]hile [the mother's boyfriend] alone may not be able to return the Child to Morocco, it is enough that he has 'knowledge' of her whereabouts and can play some role in her return."); see also Litowchak v. Litowchak, No. 2:15-CV-185, 2015 WL 7428573, at *2 (D. Vt. Nov. 20, 2015) (allowing for addition of alleged removing parent's father as respondent and rejecting respondent's redressability arguments because removing parent's father may be subject to remedies other than the return of the child).  Moreover, given that Ms. Brooks has assumed a quasi-parental role in the Child's life during the removal, the Court agrees with Petitioner's testimony that while Ms. Brooks may not have a legal ability to make a decision for the Child or to travel with the Child, she clearly has a practical ability to do so, (see Vol. I, p. 208).  Thus, it is appropriate for Ms. Brooks to remain as a respondent to afford the Mother adequate relief, including injunctive relief to prevent further concealment of the Child's whereabouts.

Child at day care, she is listed as the Child's "mother" or "guardian" with the daycare, and the Child calls her "Mommy." (J. Ex. 18, p. 11.) Before Ms. Brooks traveled with the Child and the Father from Jamaica to the United States, the Mother told Ms. Brooks via electronic message that the Child was not allowed to travel out of Jamaica and asked for assistance in having the Child returned to the Mother. (Doc. 1, p. 40.)[12] Ms. Brooks refused to assist the Mother and responded that the Mother's issues with the Father were for the Mother and the Father to solve and that "everything *we* do is according to the law and in [the Child's] best interest." (Id. (emphasis supplied).) Once in the United States, Ms. Brooks affirmatively chose not to provide the Mother with the location of the Child. When the Mother took to social media to locate the Child, Ms. Brooks received the Mother's posts from someone she knew and did not respond or otherwise take any action to make certain that the Mother knew of the Child's whereabouts. (Vol. I, pp. 219–21; J. Ex. 40.) Having observed the witnesses and reviewed the totality of the evidence in this case, the Court finds that Ms. Brooks played an integral role in the retention of the Child in the United States. See, e.g., Jacquety, No. 19 CIV. 9642 (VM), 2020 WL 5946562, at *5 (mother's boyfriend's conduct "[brought] him well within the Hague Convention's scope" where boyfriend cohabitated with mother and child and played a role in the mother and child's travels even though boyfriend could not travel alone with child); Neves, 637 F. Supp. 2d at 346–47 (finding nonparent respondents who resided with father and children and made no effort to let petitioner know the whereabouts of her children despite her numerous attempts to locate them played role in wrongful

---

[12] These messages, along with all other exhibits to the Petition, were included among the parties' joint trial exhibits, but that version is difficult to read. (J. Ex. 23, p. 24.) Thus, the Court cites to the version attached to the Petition.

retention of children).  Therefore, the Court denies Respondents' request to dismiss Ms. Brooks from this action.[13]

## II.        Prima Facie Case for Wrongful Retention

A petitioning parent must prove "by a preponderance of the evidence, that her child was wrongfully removed or retained within the meaning of the Convention."  Berenguela-Alvarado v. Castanos, 950 F.3d 1352, 1358 (11th Cir. 2020) (internal quotation marks and citation omitted).  A removal or retention is "wrongful" if:

> a) it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.

Accordingly, here, the Mother must prove three elements to establish a prima facie case of wrongful retention: (1) that the minor child was a habitual resident of Honduras immediately before her allegedly wrongful retention in the United States; (2) that the child's retention violates the Mother's "custody rights" under Honduran law; and (3) that the Mother was exercising these "custody rights" at the time of the child's retention.  See Berenguela-Alvarado, 950 F.3d at 1358.

The parties have jointly stipulated that the Mother has custody rights to the Child, (doc. 84, p. 2), and the Father does not dispute that the Mother was exercising those rights during the alleged wrongful retention, (doc. 103, p. 9).  Thus, the issues before the Court are whether the Child was

---

[13]  Nonetheless, as in Neves, the Father "clearly was the driving force" behind the Child's wrongful removal, and, therefore, the Court may decide to follow the course of the court in that case and only hold the less culpable respondent, Ms. Brooks, accountable for a smaller portion of any award of fees and costs in this case.  See Neves, 637 F. Supp. 2d at 347.

a habitual resident of Honduras at the relevant time and whether the retention of the Child violates the Mother's custody rights under Honduran law.

### A.     The Child was a Habitual Resident of Honduras.

The Hague Convention does not define the term "habitual residence." See Monasky, 140 S. Ct. at 726.  And while "a child 'resides' where she lives," id. (citing Black's Law Dictionary 1176 (5th ed. 1979)), "[h]er residence in a particular country can be deemed 'habitual,' . . . only when her residence there is more than transitory."  Id.  The United States Supreme Court has recently held that "[a] child's habitual residence depends on the particular circumstances of [the] case," and "[a]n actual agreement between the parents is not necessary to establish an infant's habitual residence."  Id. at 722, 727.  "Facts courts have considered include: a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings."  Id. at 727 n.3 (citation and internal quotation marks omitted).  However, because children—especially those too young or otherwise unable to acclimate—depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations.  Id. at 727.  The Supreme Court noted that although the "totality of the circumstances" specific to the case must be considered, a child's habitual residence will often lie in "the family and social environment in which [the child's] life has developed."  Id. at 726.  "Common sense suggests that . . . [if] a child has lived in one place with family indefinitely, that place is likely [the] 'habitual residence.'"  Id.

Here, Respondents claim that, while the Child's habitual residence was Honduras, that country was abandoned—at an unspecified time—as her habitual residence due to "the parties'

agreement, and in light of the [C]hild's residency status in the United States," and therefore "[the] Mother cannot demonstrate that Honduras was the [C]hild's habitual residence at the time of the removal or retention." (See doc. 103, p. 26.)

In 2004, in Ruiz v. Tenorio, 392 F.3d 1247, 1255 (11th Cir. 2004), the Eleventh Circuit Court of Appeals addressed the issue of when a court may find that a child's habitual residence has been abandoned and/or changed. The Eleventh Circuit relied on a Ninth Circuit opinion in holding that, "'When there is no [shared,] settled intent on the part of the parents to abandon the child's prior habitual residence,' courts should be hesitant to find a change in habitual residence unless objective facts point unequivocally to a change or the court can 'say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to changing the child's family and social environment in which its life has developed.'" 392 F.3d at 1255 (quoting Mozes v. Mozes, 239 F.3d 1067, 1081 (9th Cir. 2001)). Consistently therewith, nine years after Ruiz, the Eleventh Circuit held, in Chafin v. Chafin, 742 F.3d 934, 939 (11th Cir. 2013), that a change in a child's "habitual residence" to another country is unlikely "unless objective facts point unequivocally to a change" in the child's "relative attachments to the two countries" such that returning the child to the original country "would now be tantamount to changing the child's family and social environment."

As described above, however, in its recent opinion in Monasky v. Taglieri, the United States Supreme Court "changed 'overnight' the U.S. jurisprudence on the interpretation of the term 'habitual residence' in a Hague Convention case[, holding] that a child's habitual residence depends on the totality of the circumstances specific to the case, not on categorical requirements such as an actual agreement between the parents." INTERNATIONAL FAMILY LAW PRACTICE § 9:20

(discussing <u>Monasky</u>, 140 S. Ct. at 727).  The Eleventh Circuit Court of Appeals has not yet addressed what impact, if any, <u>Monasky</u> had on its holdings in <u>Ruiz</u> and <u>Chafin</u>.

This Court, however, need not delve into which standard (or standards) apply, as there is no basis for a finding of abandonment under either the standard adopted and applied by the Eleventh Circuit in <u>Ruiz</u> and <u>Chafin</u> or the "totality of the circumstances" standard announced more recently in <u>Monasky</u>.

First, the evidence shows that the parents did not have a shared, settled intent for the Child to abandon her habitual residence in Honduras and to change her habitual residence to a different country.  As the Court discusses more fully below in Section II.B, while the Father unilaterally intended for the Child to begin residing permanently in the United States with him at some point in the second half of 2020, the overwhelming evidence shows that the Mother never agreed to such an arrangement, and that she never agreed to anything more than the Child visiting the United States.  Similarly, while the Mother testified that she believed that she and the Father had settled on moving the Child's residence to Spain, the evidence before the Court indicates that, even though the Father promoted that idea to the Mother and led her to believe that he would agree to the Child living with her in Spain, he actually never had a settled intent for the Child to live in Spain at the time he took her from Honduras or later when he retained her in the United States.

Respondents contend that Petitioner's move to Spain unequivocally establishes abandonment of Honduras as the Child's habitual residence.  In <u>Ruiz</u>, in rejecting the respondent's claim that the child's habitual residence in Mexico had been abandoned when the family relocated to the United States, the Eleventh Circuit emphasized that there was "objective evidence that the move [to the United States] was intended to be conditional."  392 F.3d at 1255.  In affirming the district court's holding that habitual residence in Mexico had not been abandoned, the Eleventh

Circuit noted the district court's characterization of the family as having been "in limbo" when they relocated to the United States.  Id.  Similarly, here, the Mother (and the Child) could be described as having been "in limbo" when the Mother packed up and moved to Spain (only to move back several months later when it became clear the Father would not be bringing the Child to live with her there).  The evidence indicates that, like the family's move to the United States in Ruiz, the relocation here, to Spain, was intended to be conditional: the Mother was only moving to Spain on the condition that the daughter would be living there with her.[14]

The only time the parents reached a clear agreement regarding the residency and custodial status of the Child is when they executed the Settlement Agreement in February 2020.  While that agreement has not been ratified by a Honduran court, it is a clear expression of the parties' intention regarding the Child's residence executed only approximately five months before the Father left Honduras with the Child.  In that document, the parties clearly evidenced an agreement for the Child to reside in Honduras.[15]  Put simply, the parents never reached a shared mutual agreement, as described in Ruiz, for the Child to change that residence from Honduras to either Spain or the United States.

Additionally, there are little to no "objective facts point[ing] unequivocally to a change" in the Child's "relative attachments to the two countries," as required under Chafin.  The Child was

---

[14]  Additionally, as explained by the Petitioner's counsel at trial, a relocation of a parent to a country other than the Child's habitual residence does not prevent the return of that child to the petitioner at the petitioner's current place of residence.  (Vol. II, pp. 157–58 (quoting JEREMY MORLEY, INTERNATIONAL FAMILY LAW PRACTICE § 9:50 (July 2020 Update)).)

[15]  While the Father now tries to disavow the Settlement Agreement by contending it has not been ratified by a Honduran court and by claiming that the parties reached a different agreement at some unspecified time, he indicated much to the contrary to the Mother when he said that he could not give her a return date for the Child because if he was not able to meet that date, "[he] will be in violation . . . [a]nd a judge could not endorse our agreement."  (J. Ex. 7, p. 8.)

born in Honduras and lived in Honduras for the first twenty-eight months of her life. After traveling outside of Honduras with her Father in August of 2020, for the first two months the Child was exclusively in Jamaica. Even once the Child arrived in the United States, she spent at least a month commuting between Miami and Savannah, and she only began staying consistently in a home in December 2020. This was approximately two months *after* the Mother contends the wrongful retention began on October 12, 2020, and only one month before the Mother filed her Hague Petition. Thus, while there was a change in geography, the Child has not spent an appreciable period of time in the United States, much less in her Father's home there. As for Spain, the Child has only been to that country once, when she was less than a year old. Since leaving Honduras in August 2020, she has not set foot in Spain.[16] Accordingly, there are not sufficient objective facts pointing unequivocally to a change in the Child's attachments from Honduras to either the United States or Spain, as discussed in Chafin.

Finally, the totality of the circumstances—which Monasky requires courts to consider—also does not support a finding of a change of the Child's habitual residence from Honduras. As described above and discussed in Section II.B below, there simply was no agreement between the parents to change the Child's habitual residence to one particular country. The evidence shows that the Mother did not intend for the Child to reside in the United States, and she only intended for the Child to abandon her habitual residence in Honduras if the Child was going to be delivered back to her custody to live with her in Spain. The evidence to this end includes the fact that the Mother traveled to Spain with the Child's dog; that when the Mother emailed her employer regarding moving to Spain she cited her child's ability to live there; and in one of the many

---

[16] Frankly, the only tangible connection between the Child and Spain (other than the Mother having spent time there waiting for the Child to be delivered to her) is the Child's dog, which—according to testimony from both parties—was taken to Spain and remains there today because the Mother cannot afford to have it returned to Honduras. (See Vol. I, p. 151; Vol. II, p. 94.)

electronic messages on this point sent even before the Father came to get the Child from Honduras in August 2020, the Mother told him that though she had made the decision to raise the Child in Spain, she loved Honduras and did not want to leave that country and would reconsider doing so if he was not going to confirm a return date for the Child.  On the other hand, despite the Father's representations to the Mother, it appears he never truly intended for the Child to live with her in Spain.  At most, the Father's testimony indicates that he may have briefly considered the Child living in Spain, (see Vol. II, p. 99), but then abandoned that intent even before the Mother left for Spain and unilaterally decided that he would keep the Child with him in the United States.  As for the Child's attachments, the Child, who is three years old, spent her first twenty-eight months of life in Honduras, and had only previously left there twice—once to visit Spain with the Mother and the Father when she was less than a year old and once to visit the United States for approximately nine days with her Father.  She had attended an early learning center in Honduras for the entire school year prior to her departure from Honduras in August 2020.  After leaving Honduras, she spent two months in Jamaica, and had only been in the United States for roughly two months (and had been located in Savannah for less than a month) when the Mother filed the Hague Petition.  Indeed, the Father had not even established a consistent place of residence in the United States at the time he emailed his refusal to return the Child to the Mother in October 2020. At the time of the trial, the Child had been in the United States for less than six months.  Thus, while there was a change in geography to the United States, the Child had not and has not spent an appreciable period of time in the United States, much less in her Father's home here.  Neither parent testified that either of them took the bulk of the Child's personal belongings with them to the United States or to Spain.  And while the Monasky court indicated that immigration status could be relevant, the Court finds this factor not compelling in finding a change of habitual

residence to Spain or the United States—the Child had citizenship in Spain and Honduras and a temporary residence status in the United States. Additionally, the parties clearly intended for the custody of the Child to be adjudged in Honduras as they filed their Settlement Agreement with the court there, and neither party has dismissed the custody litigation still pending in the Honduran court. Furthermore, pursuant to the Hague Convention's own terms, a child's family and social environment is unlikely to change if less than a year elapses between removal and a return petition. Hague Convention, Art. 12 (imploring "the return of the child forthwith" if less than a year elapses between removal and a petition). Based on all the foregoing, the Court finds that neither Spain nor the United States constitutes "the family and social environment in which [the Child's] life has developed." See Monasky, 140 S. Ct. at 726 (quoting 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report in 3 Actes et documents de la Quatorzième session, p. 428, ¶11 (1982)).

Lastly, in Monasky, the Court emphasized that where there are special circumstances— "for instance, [where] an infant lived in a country only because a caregiving parent had been coerced into remaining there"—those circumstances "should figure in the calculus" of determining the child's habitual residence. Id. Here, having presided as the finder of fact in this case, the Court finds that the Father persuaded and coerced the Mother to move to Spain while the Child was in the Father's physical custody. The Mother testified that she moved to Spain because the Father convinced her to do so, and he insisted on the benefit of moving there. (Vol. I, pp. 183–84.) Even the Father testified that he told the Mother to go to Spain with Ms. Lizardo (the nanny) and the Child because they could all three fly there without needing visas and that he later recommended that the Mother travel there by herself. (Vol. II, pp. 47, 99.) Indeed, the Father even reimbursed the Mother for her moving expenses to Spain. (Vol. I, p. 210.) In the parties' electronic messages

shortly before and after the move, he led the Mother to believe that he would return the Child to her primary custody in Spain.  Moreover, the Father was aware that the Mother could not enter the United States as he had previously been involved in her unsuccessful visa applications.  (Vol. II, p. 98.)  It would be a cruel result and in contradiction of the Hague Convention's purposes if a father could "pull a bait and switch" by first coercing a mother to move away from her home country and then taking the mother's child to a different country that he knows the mother cannot enter, and then claiming that the mother cannot seek return of the child to the mother's home country because she abandoned that country.  Having included these "special circumstances" into its "calculus," the Court finds that the evidence in this case demonstrates that the Mother did not intend for the Child to abandon Honduras as her place of habitual residence unless or until the Child was brought to her in Spain so that the Child could begin residing there.  (See, e.g., doc. 98-7, p. 7 ("I don't care where if in Spain or Honduras, I want a date . . . of when you're going to give [the Child] back to me.").)  As that never happened, the Child never abandoned her habitual residence of Honduras.

Thus, taking the totality of the circumstances into consideration, the Court finds that, from the date of the Child's birth through the date of this Order, the Child has been at home in Honduras and that country has been and remains her country of habitual residence.  Thus, at the time the Father removed the Child from Honduras in August 2020, Honduras was the Child's country of habitual residence and the Child's habitual residence has not been abandoned or otherwise changed by the Father's move to the United States or the Mother's brief move to Spain.  Thus, whether judged from the date alleged in the Mother's Petition, October 12, 2020, or some earlier or later date, the Mother has established that Honduras was the Child's habitual residence at the time the Father retained the Child.  This determination is not only supported by a preponderance of the

evidence presented to the Court, but it also best satisfies the aim of the Hague Convention: "to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the Child is at home."  Monasky, 140 S. Ct. at 727; see also id. ("The signatory nations sought to afford courts charged with determining a child's habitual residence 'maximum flexibility' to respond to the particular circumstances of each case.").  Accordingly, Honduras constitutes the country of the Child's habitual residence.

### B.      The Retention of the Child Violates the Mother's Custody Rights under Honduran Law.

"Article 3 of the Hague Convention provides that the removal or retention of a child is wrongful where it violates the custody rights of another person that were actually being exercised at the time of the removal or retention . . . ."  Lops v. Lops, 140 F.3d 927, 935 (11th Cir. 1998). "The removal [or retention] of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if the petitioner 'is, or otherwise would have been, exercising custody rights to the child under that country's law at the moment of removal [or retention].'"  Id. at 936 (citation omitted).

Testimony from legal experts presented during the hearing established that both the Mother and the Father have "patria potestad" (or "patria potestas") rights over the Child.  (Vol. I, pp. 80– 81; Vol. II, pp. 110–11; see also J. Ex. 59, p. 2 (containing translation of Honduran Family Code, Title V (Custody), Chapter I (General Provisions), Art. 187).)  Among the rights a parent with patria potestad rights has is the right to choose where the child is domiciled.  See Diaz Huete v. Sanchez, 18CV01485AJTIDD, 2019 WL 4198658, at *5 (E.D. Va. Aug. 16, 2019), *report and recommendation adopted sub nom.* Huete v. Sanchez, 118CV1485AJTIDD, 2019 WL 4195336 (E.D. Va. Sept. 4, 2019) (citing Alcala v. Hernandez, No. 4:14-cv-4176-RBH, 2014 U.S. Dist. LEXIS 153728, at *15 (D.S.C. Oct. 30, 2014)).  Honduran law provides that, upon a disagreement

between parents who both have patria potestad, "the competent court will decide" the issue. (J. Ex. 59, p. 2 (translation of Honduran Family Code, Title V (Custody), Chapter I (General Provisions), Art. 187).) Accordingly, one parent cannot unilaterally decide to keep a child in another country (and change the child's domicile to that country) against the objection of the other parent, which is what the Mother has alleged occurred here. It cannot be disputed that the Father has decided to retain the Child in the United States and away from Honduras, which the Court has determined to be the Child's country of habitual residence. In her Petition, and at trial, the Mother states that the retention occurred on October 12, 2020, when the Father emailed her that he would not return the Child to her. (Vol. II, pp. 156–57.) The Court finds that the Father retained the Child by at least that date.[17] Respondents, however, assert that the retention of the Child was not "wrongful" because, as they assert in their affirmative defense, the Mother had consented not only to the Father taking the Child out of Honduras but also to the Child residing permanently in the United States with him.

Just as the Mother must prove that the retention of the Child violated her custody rights by a preponderance of the evidence in order to make out a prima facie case, so too must Respondents prove the affirmative defense of consent to the retention by a preponderance of the evidence if they wish to succeed on that defense. See Berenguela-Alvarado, 950 F.3d at 1359 ("The consent

---

[17] Arguably, the Father retained the Child even earlier when the Mother repeatedly messaged him notifying him that the time span he was to have the Child pursuant to the parties' intentions expressed in the Settlement Agreement had passed, and asking for a date for the Child's return. The Father's responses to those messages (when he responded) were at most noncommittal. Regardless, the exact date the Father's retention of the Child became wrongful is difficult to pin down because the Mother consented to a temporary removal of the Child, the Father initially cited travel difficulties due to COVID-19 as an excuse for his inability to return the Child, and it is not clear when the Father formed the subjective unilateral intent to not return the Child. However, the Father's retention of the Child became wrongful by at least October 12, 2020, when the Mother knew or should have known, based on the Father's email message, that he was not intending to return the Child to her. Of course, because the Court has found that Honduras always has been the Child's country of habitual residence and remains so, and because there are no disputes regarding the timeliness of the Petitioner's Petition, affixing an exact date for the retention of the Child is not as critical as in other cases.

defense requires the retaining/removing parent to prove by a preponderance of the evidence that the petitioning parent consented to . . . the removal or retention.") (quotation omitted); see also 22 U.S.C. § 9003(e)(2)(B) (establishing evidentiary standard for consent defense); Hague Convention, Art. 13(a). Because these showings involve and hinge on the same findings of fact, the Court will address them together.[18]

"The petitioning parent's consent needn't be formal, but it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." Berenguela-Alvarado, 950 F.3d at 1359. "The focus of the court's inquiry should be on the petitioning parent's 'subjective intent,' and should take into account [t]he nature and scope of the petitioner's consent, and any conditions or limitations on that consent." Id.; see also Larbie v. Larbie, 690 F.3d 295, 308 (5th Cir. 2012) ("The focus of [the] inquiry is the petitioner's subjective intent . . . as evinced by the petitioner's statements or conduct, which can be rather informal.") (internal quotation marks and citations omitted). The inquiry regarding consent is "fact-intensive" and depends upon the Court's "factual and credibility determinations." Padilla, 850 F.3d at 176. Conduct after removal can be useful in determining whether consent was present at the time of removal or retention. Wanninger v. Wanninger, 850 F. Supp. 78, 81–82 (D. Mass. 1994).

---

[18]  In his Proposed Findings of Fact and Conclusions of Law, the Father also asserts that, by signing the travel authorization with no return date along with "numerous other documents," the Mother "evidenc[ed] her *acquiescence* to the Child's residency status in the United States." (Doc. 103, p. 18 (emphasis added).) "Consent and acquiescence are two separate and 'analytically distinct' affirmative defenses. Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner *subsequently agreed to or accepted* the removal or retention. Courts have explained that the acquiescence defense often requires more formality than consent; accordingly, to find acquiescence we look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time." Padilla v. Troxell, 850 F.3d 168, 175–76 (4th Cir. 2017) (emphasis added). Any attempt by the Father to maintain an acquiescence defense fails. First, the documents he claims evince the Mother's acquiescence were signed *prior to* the removal and retention of the child and thus do not show a *subsequent* agreement or acceptance. Additionally, just as the Court finds that none of the documents demonstrate consent, the Court likewise finds that the documents fail to meet the even tougher evidentiary requirements for showing acquiescence.

Here, the Respondents rely heavily on the travel authorization as proof that the Mother consented to the Father's permanent removal and retention of the Child from Honduras.  The Court does not find the travel authorization to be compelling evidence that the Mother intended for the Child to move permanently to the United States with the Father.  A leading commentator on the Hague Convention offered the following summation of the use of travel authorizations:

> The taking parent often seeks to rely on a travel authorization document supplied by the petitioner as evidence of the petitioner's consent.  Often, these documents, which are required for a parent to take a child out of many countries, have no return date.  Nonetheless, courts have generally held that they are not good evidence of a consent to keep the child permanently away from the child's habitual residence.

JEREMY MORLEY, INTERNATIONAL FAMILY LAW PRACTICE § 9:50.   See also Alvarez Romero v. Bahamonde, No. 1:20-cv-104(LAG), 2020 WL 8459278, at *10 (M.D. Ga. Nov. 19, 2020) (citing Giampaolo v. Erneta, 390 F. Supp. 2d 1269, 1283 (N.D. Ga. 2004) (finding petitioner did not consent to child's removal by executing an authorization to travel document)); see also Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) ("The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.").

In this case, while the travel authorization is evidence that the Mother consented to the Father traveling with and spending *some* time with the Child outside of Honduras, the fact that the Mother signed a travel authorization that did not specify a return date is not persuasive evidence that she did not expect or intend for the Child to be returned to her custody after visiting with the Father.  First, testimony presented by both parties indicated that a return date was not necessary on the travel authorization, as the document is only needed for a parent and a child to depart from Honduras.  Additionally, the return information was not intentionally omitted, at least not by the Mother.  The Mother credibly testified that the Father's attorney drafted this document and that

the attorney brought it to the Mother's home to get her to sign it in what the Mother felt like was an emergency situation. Both parties testified that, in the past, the Father had taken legal action against the Mother when had she refused to sign travel authorizations. The evidence additionally shows that, immediately after signing the document and realizing that it did not specify a return date, the Mother began incessantly asking the Father to tell her when he would return the Child to her. She even specifically asked him to confirm that the plan was for the Child to be with him for six weeks (i.e., the time given to him so far for the year according to the Settlement Agreement). And when she proposed that the Child be returned to her in the middle of September, the Father replied only very vaguely with responses such as, "We'll see," and "[W]e can't place an exact date [b]ecause at this time there aren't set dates for anything." (J. Ex. 7, pp. 6–7.) The Father's silence and misleading statements in response to the Mother's repeated and vociferous entreaties proves that the parties had not made some agreement that the Child would move permanently with the Father. Under these circumstances, any reasonable father who had reached an agreement with the mother not to return their child to the mother would have raised that agreement. However, in response to the Mother's numerous requests for a return date (and indeed throughout the ensuing weeks of contentious communications), the Father never mentioned or reminded the Mother of the supposed agreement that, once he and the Child left Honduras, the Child would begin to reside permanently with him, with the Mother having only visits with the Child when he could bring her to Spain. Quite to the contrary, at one point the Father said he did not want to specify a "***return*** date" because "if for whatever reason" he could not "***return*** her," he would be "in violation . . . [a]nd a judge could not endorse our agreement." (Id. at p. 8 (emphasis supplied).) Further, the Father told the Mother that once she had established residency in Spain, "***I'll leave the Child with you***." (Id. at pp. 8–9 (emphasis supplied).) These statements would reasonably have led any

person to believe that the Father intended to return the Child to her and that the parties would continue to abide by the terms of the Settlement Agreement regarding custody and visitation, meaning the Child would continue to live with the Mother and have scheduled visits with the Father.

Similarly, the Father's assertion that the Mother understood that the Child needed to live with the Father in the United States to obtain permanent residence status here and that she therefore consented to his retention of the Child in the United States in the fall of 2020 is not supported by the evidence. The Father maintains that having the Child live with him in the United States is necessary for her to obtain the proper visa status so that she can attend school here, which he claims the parties have "always" planned for her to do. In his testimony before the Court, the Father repeatedly referred to his actions concerning the Child's status in the United States as being "the next step in the process." (See Vol. II, pp. 40, 50, 53, 54, 77.) It is not clear from the testimony and documentary evidence, however, what the specific goal of this "process" was at various points in time and, more importantly, whether the Mother was told, understood, and agreed to the goal(s). At one point, the Father testified that he "started working on the process **to get [the Child] to go to school in the United States**," (Vol. II, p. 40 (emphasis supplied)), while at another point he and his counsel referred to "the process **to secure the [child's] visa**," (id. at p. 51 (emphasis supplied)), and yet at other times he seemed to be referring to a grander scheme involving a more long-term process: getting a visa for the Child to enter the United States and reside there temporarily so that she could *then* apply for permanent residence (i.e., adjustment of status), (id. at pp. 51–52). It is clear from the testimony that the Father explained—and the Mother understood—that *prior* to February 2020, the Father was working to secure a visa (which would afford the Child the *ability* to enter and temporarily reside in the United States) and to secure a social security number for the

Child (the significance of which was never clearly explained at trial); however, the overwhelming evidence shows that the Father never explained to the Mother that he was taking steps to obtain *permanent* residency status for the Child in the United States, particularly after the parties executed the Settlement Agreement in February 2020, nor that he intended for the Child to actually reside here permanently.  While the Father testified that he told the Mother that the Child would have to reside in the United States, the Mother vehemently denies having been aware of this permanent residence plan.  The Mother points to evidence (including the Settlement Agreement and written communications) that supports her version of events, whereas the Father has not pointed to any documentation or written communications corroborating his testimony and showing that he clearly communicated this to the Mother.  Given how frequently the parties communicated via written means and how they often documented their intentions and plans in those communications (or even in formal signed statements drafted by legal counsel), the Court finds this absence of supporting documentation compelling.  Indeed, the Father testified that "[e]very time we've done anything regarding [the Child's papers], . . . we sent [the Mother] an email with the explicit reason to also confirm it."  (Vol. II, p. 53.)[19]  If the parties had reached an agreement on an issue as monumental as changing the Child's primary custodian and changing her habitual residence to a country the Mother cannot enter, it would be expected that the Father (or one of his attorneys) would have followed this practice and "sent an email with the explicit reason to also confirm it."

---

[19] The Father claimed that he followed up with emails because the Mother frequently changes her mind. Claims that the Mother has "mood swings" and changes her mind appears to be a tactical position taken by the Father in an attempt to explain away the Mother's numerous written communications that directly contradict the Father's claim that the Mother consented for the Child to live primarily in the United States in August of 2020.  However, having reviewed the entirety of the record, the Court finds that it is the Father's mindset, not the Mother's, that seems to shift and that is more difficult to pin down.  For instance, while the Father has never consistently explained when or how the parties reached the supposed agreement for the Child to live with him permanently in the United States, the Mother never wavered—throughout written messages during the second half of 2020, during her testimony at her deposition, and while testifying at trial—in maintaining that she never consented to such an arrangement.

Yet despite all the documentary evidence in this case, he has not produced an email or other electronic or written communication documenting that the Child would primarily live with him in the United States, much less the reasons for doing so.  This absence of evidence is particularly compelling considering the fact that, roughly two weeks before the Immigration Petition was submitted, the Father had joined the Mother in executing the comprehensive Settlement Agreement, which clearly did not contemplate or even hint at an impending plan for the Child to move to the United States by the end of the year.  (Quite to the contrary, the Settlement Agreement required the Child to attend a specific school in Honduras.)  It would be entirely reasonable for the Mother to assume that the Father, who currently has residency status in the United States, Guatemala, and Jamaica himself, would be seeking "residency status" for the Child in the United States for purposes of ease of travel, and not necessarily with a plan for the Child to move there. Based on the foregoing, the Court finds the Mother, who testified that the Father never told her (and that she never agreed) that the Child would be moving to the United States to live with him, to be the more credible witness on this topic.

Additionally, various statements made by the Father, which Respondents claim show that the parties had agreed to a change in permanent custody, likewise do not support a finding of consent.  For instance, when the Father made a vague reference in an email in mid-September to the Child being "now under [his] care," the Mother responded by asking if he was trying to take custody of the Child away from her.  (J. Ex. 8, p. 6.)  Rather than replying in the affirmative and reminding the Mother of the agreement that he claims they reached for him to do exactly that, the Father simply said nothing.  Indeed, throughout August and September of 2020, the Mother made it abundantly clear to the Father through written communications that she did not agree to the Child

being in the Father's primary custody, and the Father never responded with a statement that she had so agreed.

As for the Father's October 2020 emails, these messages appear to be an after-the-fact unilateral attempt by the Father to memorialize an agreement that never existed, and they are by no means contemporaneous evidence of mutual consent by the Mother and the Father.  Moreover, true to form, even in these emails the Father does not clearly set forth the terms of the parents' supposed agreement.   The Father's October 12 email, where he announced that he would no longer pay child support to the Mother, does not clearly reference a decision—much less an *agreement*— that the Child would live permanently with him.  (J. Ex. 5 ("I will stop sending money to cover the [C]hild's expenses since she is now living with me, and I am supporting all [her expenses].").) The closest thing to a declaration from the Father that the Child would be living with him came in his October 22 email that said, "We agreed to remove [the Child] from Honduras due to the risk caused by the global pandemic as well as due to your selling of a vehicle to a presumed drug dealer[.]  . . .  When the situation [with COVID-19] gets better we will travel to Spain so you can see [the Child] . . . ."  (J. Ex. 3, p. 4.)  Tellingly, this email uses only vague and cryptic language; for instance, rather than saying that the parties agreed for the Child to move permanently with the Father to the United States, it says only that the parties agreed "to remove [the Child] from Honduras."  Similarly, rather than stating that, once he and the Child were settled in the Child's new home in the United States, he would bring the Child to Spain for a one-month visit with the Mother, he states that he and Child will "travel" to Spain "so you can see [the Child]."  Moreover, even if this language does provide some evidence that the Father planned for the Child to live with him and only visit the Mother, it, critically, does not provide evidence that the parties had mutually agreed to that plan.  Indeed, the Mother's immediate response, denying having ever agreed that

the Child would reside with the Father, (R. Ex. 2, p. 13), undermines the Father's claim that his email shows that the Mother had consented or acquiesced to the Child residing with him.[20] Furthermore, the Court notes that, at this point, the Father and the Child were in Jamaica and none of the Father's messages or emails had yet referred to what he alleges was the actual plan: for the Child to move to and live *in the United States* in order to satisfy immigration requirements, which he claims was the main reason for having the Child live with him.

Finally, the Court rejects the Respondents' assertion that an August communication the Father made to the Mother shows that they had agreed that, once the Father took her, the Child would no longer live with the Mother. The Father testified at the hearing that an early August message to the Mother—where he stated, "And what happens if . . . they have another lockdown . . . [a]nd I can't leave [the Child] there for a month[?]"—is clear evidence that the plan was for him to bring the Child to the Mother in Spain only for a one-month visit. (See Vol. II, pp. 62–64; J. Ex. 7.) Respondents cherry-pick this one comment from numerous messages both before and after this message in which he and the Mother indicated the Child would live with the Mother, including messages where the Father indicated that he would "return" the child to the Mother or "leave" the Child with the Mother.[21] Particularly when seen in that context, this hypothetical comment is far too vague to be considered persuasive evidence that the Mother understood—much less agreed—

---

[20] When asked by the Court at trial, the Mother confirmed that, prior to receiving these October 2020 emails, neither the Father nor anyone acting on his behalf had ever communicated to her that the Father intended to have the child live permanently with him. (Vol. I, pp. 211–12.)

[21] During these communications regarding the Mother's desire for a return date and the Father's refusal to provide one, the Father never raised the supposed agreement for the Child not to be returned to the Mother. Rather, the Father used travel restrictions and health risks posed by COVID-19 as his excuse. The Father's raising of travel restrictions and health risks is dubious given that he traveled with the Child on at least one international flight from Jamaica to the United States during this time and then traveled with her, on multiple occasions, between Miami and Savannah, two cities that were experiencing significant outbreaks of COVID-19 during this period.

that, after August 2020, the Child would reside permanently with the Father and would only visit

with the Mother for one month.[22]  Indeed, in his testimony explaining this comment, the Father

never actually said that he and the Mother had discussed or agreed upon his plan, much less did he

testify to any comments or conduct by the Mother showing she understood and/or acquiesced to

his intended plan; the Father testified only that this was *his intention*.  (See Vol. II, pp. 62–64 ("Q.

. . . [W]hen you're referring to taking her back to Spain, what was *your intentions* [sic] when you

were saying that you were going to take her back to Spain?  A.  We were going to spend a month

there.  . . .  And she was going to spend time with her mom during the month that we were there.

. . .  Q.  So when you say 'I cannot leave her there for a month,' I mean what were *your intentions*

in saying that to her?  A.  That I would not commit to any dates that would allow -- impede me to

leave her there for a month with her mom until we came back to the States.") (emphasis supplied).)

Moreover, as pointed out above, a review of the totality of the Father's communications during

this time reveals that he frequently told the Mother he would "return" the Child and "leave" the

Child with her.

On the other hand, the evidence that the Mother did *not* consent to having the Child move

to the United States to live with the Father is abundant.  From the moment the Mother signed the

travel authorization, she repeatedly and vehemently requested (and, at times, demanded) for the

Father to tell her when the Child would be "returned" or "give[n] back" to her.  In no instance did

she ever refer to an expectation, an intention, or an agreement that she would have only a "visit"

with the Child, much less that the Father was assuming permanent physical custody of the Child

in the United States.  Each and every time the Father made a statement or undertook an action that

even vaguely indicated that he intended to keep the Child with him indefinitely, the Mother

---

[22]  The Father never testified about any planned or intended schedule for the child to visit the Mother after the one-month visit he described at the hearing.

objected.  Had the parents truly reached an agreement supporting the Father's position, the Father would be expected to raise that agreement in response to the Mother's repeated objections. However, the Father did not so respond and often did not respond at all.  The Father's silence in the face of the Mother's messages is a quintessential admission by silence.  Further, the Father has not presented, and the Court has not reviewed, any document signed by the Mother that would demonstrate she understood or consented to the Child moving to or becoming a permanent resident of the United States.

Moreover, the Child's live-in nanny, called as a witness by the Father, testified that no one had told her that the Child was going to live with the Father permanently in the United States and that the plan was for the Child to remain with the Mother and the nanny, and that plan only changed when the Father did not return the Child.  (Vol. II, pp. 17–25.)  As detailed above, even the Father's own attorney emailed both the Mother and the Father that the Child would be returned to the Mother and that "in every event, the custody of the minor belongs to [the Mother]."  (P. Ex. 2, p. 11.)  Having reviewed the totality of the record, there is simply no credible evidence that supports the Father's claim that the Mother consented to his permanent retention of the Child in the United States.

Finally, as laid out in detail above, the Father and Ms. Brooks frequently neglected or even refused to tell the Mother where the Child was located, which supports a finding that the Mother was unaware of—much less "on board" with—the Father's plan to have the child live permanently with him in the United States.  Even believing the Father's account (which for reasons explained above, the Court does not), the Father did not tell the Mother that he and the Child had left Miami and settled in Savannah, until at least a month after they moved here.  Further, Ms. Brooks testified that she chose not to reveal the Child's whereabouts to the Mother—who was making very clear,

both in direct messages and in social media posts, that she did not know where her child was. Respondents would have no reason to hide the Child's whereabouts from the Mother if they were acting in accordance with some agreement between the Father and the Mother for the Child to live with the Father in the United States. Respondents' covertness and refusal to provide the Mother with the Child's location demonstrates that Respondents were acting unilaterally and that the Mother did not know about, much less consent to, the Father's plan to have the Child move permanently to the United States.

In light of all the foregoing, the Court finds that the Mother has shown by a preponderance of the evidence that the Respondents have wrongfully retained the Child since at least October 12, 2020, after the Father removed the Child from her habitual residence of Honduras for a visit in August 2020. The Mother has thus established a prima facie case of wrongful retention. The Respondents have failed to show by a preponderance of the evidence that the Mother consented or acquiesced to the retention of the Child. The Mother having established a prima facie case by a preponderance of the evidence and the Respondents having failed to prove a consent defense by a preponderance of the evidence, the Court turns to the Respondents' sole remaining affirmative defense: the grave risk of harm exception.

### C.   Respondents Have Failed to Show, by Clear and Convincing Evidence, that the Child Faces a Grave Risk of Danger if Returned to Honduras.

A respondent may assert as an affirmative defense that returning the child to its country of habitual residence would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation. Hague Convention, Art. 13(b); 22 U.S.C. § 9003(e)(2)(A). This exception, like the other exceptions under the Hague Convention, is to be narrowly construed. Gomez v. Fuenmayor, 812 F.3d 1005, 1011 (11th Cir. 2016). Grave risk must be established by clear and convincing evidence. Id. at 1012; 22 U.S.C. § 9003(e)(2)(A). The party invoking the

defense must demonstrate a risk that is more than "merely serious."  DEPARTMENT OF STATE, HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION; TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494-01, 10510 (1986).  This defense is not a consideration of the best interests of the child and return should not be denied on the basis that the country of removal provides better educational and financial opportunities or stability to the child than the return country.  Id.  "In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm."  Gomez, 812 F.3d at 1012 (citing Seaman v. Peterson, 766 F.3d 1252, 1262 (11th Cir. 2014)).

Courts have recognized a grave risk in cases where third parties have made credible threats of harm to a parent or child.  See Velasquez v. Funes de Velasquez, 102 F. Supp. 706, 812 (E.D. Va. 2015) (recognizing grave risk where return would be to "one of the most dangerous and violent countries in the world" and at least two prior threats of violence had been made against mother and daughters, which the court deemed credible); Taylor v. Taylor, No. 10-61287-CIV-JORDAN, 2011 WL 13175008 (S.D. Fla. Dec. 13, 2011) (finding a grave risk to exist where third persons have threatened father and mother over father's fraudulent activities).  Domestic abuse or violence directed at a parent may constitute a grave risk if the return would place the child in danger of similar violence.  See Gomez, 812 F.3d at 1013.  In such circumstances, "the requisite finding for the exception to apply is not that the child has previously been harmed, but rather that return would expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation."  Baron v. Beaty, 526 F.3d 1346 (11th Cir. 2008).  "Spousal violence, in certain circumstances, can also establish a grave risk of harm to the child . . . when it occurs in the presence of the child."  Gomez, 812 F.3d at 1014 (quoting Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2014)).

After considering the evidence described more fully in Background Section III.F, supra, the Court concludes that the Respondents have failed to prove, by clear and convincing evidence, that the Child will face a grave risk if returned to Honduras.  There is no evidence that the Mother has ever physically, verbally, or mentally abused the Child.  Indeed, the nanny—whom the Father called as a witness and who lived with the Mother and the Child—testified that she has never even seen the Mother yell at the Child or anyone else.  (Vol. II, p. 20.)  There is evidence that the Mother was violent toward the Father on one occasion years ago.  While domestic violence is of course always concerning, Ms. Ferrer de Monzon's description of that incident indicates that this was not an unprovoked inexplicable attack but rather the result of a heated argument between the Father and the Mother during which the Father's bedroom was torn apart.  (Id. at pp. 11–12.)  Moreover, that episode occurred prior to the Child's birth, and there is no evidence that the Mother has been violent toward the Father—or toward anyone, for that matter—since the Child was born, much less in the presence of the Child, or that she has since abused alcohol.

There is evidence that—prior to the birth of the Child—the Mother sought psychiatric treatment following the deaths of both of her parents; this, however, falls woefully short of the evidence necessary to establish grave risk.  While a parent's mental illness could no doubt pose a grave risk to a child in an extreme case, an allegation that a mother somehow poses grave risk to her child simply because she sought mental health treatment in the past only perpetuates the unfortunate stigmatization associated with such medical care, which the Court hopes was abandoned years ago.  Moreover, there is simply no evidence to support the Father's assertion that the Mother currently has a serious untreated mental illness that poses a grave risk of harm to the Child.  Additionally, while the Court does not condone the fact that the Mother has allowed the

Child to be transported in a vehicle without being secured in a child safety seat, these two past incidents do not demonstrate a risk that is more than "merely serious."

It is hard to believe that the Father believes that any of the incidents pertaining to the Mother actually indicate a grave risk of harm to the Child.  All these incidents occurred prior to his execution of the Settlement Agreement in February of 2020 wherein he agreed that the Mother would have primary custody of the Child.  He did not raise any safety concerns with the Honduran court then, or at any other time during the Child's life.  Indeed, in the many communications between the parties offered into evidence, the Father never indicated that the Child should not be in her mother's care because the Mother poses some sort of a safety risk.  Thus, it appears the issues he raises are not legitimate concerns but rather part of an after-the-fact attempt to justify his wrongful removal of the Child.

Likewise, while the Father may personally believe that Honduras is generally so dangerous that the Child should not be returned there, the Court finds that he has failed to prove this by clear and convincing evidence.  The Court does not take lightly the fact that the Mother's father and uncle were victims of gun violence (several years prior to the birth of the Child), that the Mother and the Child witnessed gun violence directed at the occupants of a vehicle adjacent to their own, or that the Mother sold her vehicle to an individual (whom she did not previously know) who was kidnapped and may have been killed.  However, there is no evidence that the Mother or the Child have been the target of any violence or threats of violence, nor is there evidence that anyone to whom they are related or with whom they are affiliated has been the victim or target of any violence since the Child's birth.  As for the unfortunate events that unfolded after the Mother sold the car, which caused her and the Father to fear that she could be in danger, the testimony at trial shows that Mother has been back in Honduras for several months now and has experienced no threats or

violence.  Courts in the Eleventh Circuit have repeatedly held that "general and unsupported assertions [that] a country is dangerous does not meet the standard for showing a grave risk of harm."  Da Silva v. Vieira, No. 6:20-cv-1301-Orl-37GJK, 2020 WL 5652710, at *7 n.12 (M.D. Fla. Sept. 23, 2020) (citing De La Riva v. Soto, 183 F. Supp. 3d. 1182, 1199 (M.D. Fla. 2016)); see also Marquez v. Castillo, 72 F. Supp. 3d 1280, 1287 (M.D. Fla. 2014) (mother's claims that she feared for her life if she returned to Mexico, that father's residence was in a dangerous neighborhood with active drug activity, and that one of father's nephews was a drug addict who consumed drugs outside of the home were too vague and generalized to support the affirmative defense); Crespo Rivero v. Carolina Godoy, No. 18-23087-CIV, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018) ("Venezuela's current political unrest" did not rise to the level of posing a grave risk of harm).  Accordingly, the Court finds that the Respondents have failed to carry their burden of proving, by clear and convincing evidence, that the Child will face a grave risk of harm if she is returned to Honduras.

## III.    Attorney's Fees and Costs

In her Petition, the Mother requested that the Court "award to [her] all legal costs, fees, and other expenses [she] has [incurred] and will incur to effectuate the child's return," including "court costs, legal fees . . . and transportation costs related to the return of the child."  (Doc. 1, pp. 13–14.)  With respect to the award of attorney's fees and costs, ICARA provides, in pertinent part, as follows:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3). An award of fees and costs serves two purposes: (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention," and (2) "to deter such removal or retention." DEPARTMENT OF STATE, HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION; TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494–01, 10511. During the upcoming status conference, which is described in the Conclusion Section below, the Court will discuss with the parties whether to schedule a hearing, or to instead simply accept briefing, on this issue of the amount of attorney's fees and costs to which Petitioner is entitled (and the share to be apportioned to each Respondent).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Petitioner Andrea Yamalath Rishmawy's Petition for the Return of the Minor Child Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. (Doc. 1.) The Court is aware that the Mother is unable to enter the United States to retrieve the Child. Accordingly, the Court **ORDERS** all parties and their counsel to attend a **telephonic** status conference on **<u>Thursday, May 6, 2021</u>**, during which the Court will discuss and finalize with the parties and their counsel the logistics of returning the Child to Honduras safely and expeditiously.[23] Counsel for the parties are **ORDERED to confer with their client(s)** and then **to confer with each other** prior to the status conference to discuss (1) the preferred method(s) of being heard on the attorney's fees and costs award, and (2) a method for the expeditious return of the Child in a manner that best serves the Child's interests. The Court **DIRECTS** counsel and the parties to work together in good faith to resolve these issues and to be prepared to present a joint proposal to the Court to resolve them. Finally, the parties are

---

[23] Judge Baker's courtroom deputy clerk will be in contact with counsel regarding the specific time the conference will be held as well as directions for attending telephonically. During the status conference, the Court will also determine when and how the Respondents' passports and other travel-related documents will be returned to them.

**REMINDED** that, since this matter has not yet reached final adjudication, the terms of the Court's

Temporary Restraining Order, (doc. 59), remain in effect.

      **SO ORDERED**, this 4th day of May, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA